EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------x

INTERNATIONAL CHARTERING SERVICES, INC.    :

     AND    :

PERACO  CHARTERING (USA) LLC,    :

           Plaintiffs,    :

    -against-    :

EAGLE BULK SHIPPING INC., ANEMI MARITIME
SERVICES, S. A.; Bittern Shipping LLC; Kingfisher
Shipping LLC;  Avocet Shipping LLC;  Crane    :
Shipping LLC; Wren Shipping LLC; Jay Shipping LLC.;
Canary Shipping LLC; Martin Shipping LLC; Thrasher    :
Shipping LLC;  Woodstar Shipping LLC; Nighthawk
Shipping LLC; Oriole Shipping LLC and Owl Shipping    :
LLC.

                   :

           Defendants.    :

------------------------------------------------------------------x

Index No. _____

COMPLAINT

     Plaintiffs, International Chartering Services, Inc. and Peraco Chartering (USA) LLC, by

their attorneys, Keane & Marlowe, LLP, complaining of the above-named defendants, allege

upon knowledge, and/or information and belief as to all other matters, as follows:

## NATURE OF THIS ACTION

     1. This action arises out of defendant Eagle Bulk Shipping Inc.'s (hereinafter

"Eagle"), defendant Anemi Maritime Services, S.A.'s (hereinafter "Anemi"), and the remaining

thirteen corporate defendants' (hereinafter collectively referred to as  "defendants" or "Owners")

breach of both oral and written brokerage agreements pursuant to which defendants were to pay

plaintiffs, International Chartering Services, Inc. (hereinafter "ICS") and Peraco Chartering (USA) LLC (hereinafter "Peraco")(collectively the "Brokers") an agreed percentage of brokerage commissions for services rendered in connection with thirteen (13) charter fixtures described hereinbelow.

2. The subject May 4, 2007 brokerage agreements were originally entered into between plaintiffs and Anemi, a wholly-owned subsidiary of Kyrini Shipping, Inc. ("Kyrini") which, in turn, was Eagle's predecessor in interest in the ownership of the remaining corporate defendants. (A copy of the May 4, 2007 email exchange confirming plaintiffs' commission agreement is attached hereto as **Exhibit 1**.)

3. Historically, the brokerage commissions plaintiffs negotiated with Anemi were based upon hire earned and paid for the charter of the owners' vessels.

4. The 2007 charterparties involved in the instant dispute, which provided for the charter of the thirteen vessels, were entered into between the defendant corporate owning companies, as designated by Anemi, and Korea Line Corporation as Charterer (hereinafter "KLC" or "Charterer"), prior to Eagle's July 2007 purchase of defendant Anemi and its subsidiary single purpose vessel owning companies.

5. The time charters, which involved varying durations, were dated February 1, 2007, February 27, 2007, April 17, 2007 and April 23, 2007 (hereinafter "KLC Charterparties") and, upon information and belief, continue to date with certain agreed upon contractual modifications and substitutions having been made by the various owners and Charterer.

6. Defendant Eagle has made payments of commissions to plaintiffs on the hire earned and paid on each of the thirteen vessels commencing with the delivery of each vessel to

2

the Charterer. (Copies of the commission payments made to plaintiffs ICS and Peraco by defendant Eagle to date are attached hereto as **Exhibits 2 and 3,** respectively.)

7. Despite defendants' solicitation and utilization of plaintiffs' services in connection with various aspects of said charters, in/about the first quarter of 2011, defendants made certain modifications to the terms of the charterparties, including the incorporation of a so-called "suspension period."

8. Based upon these modifications, defendants then refused to continue to pay plaintiffs any commissions on the hire earned and paid during the alleged suspension period.

9. These modifications to the KLC Charterparties were made by defendants in/about March 2011, well after Eagle's July 2007 purchase of Anemi and the remaining corporate defendants herein.

10. As a result of defendants' recent refusal to continue to pay the commissions due under plaintiffs' brokerage commission agreements, plaintiffs seek compensatory damages for all outstanding commissions, presently estimated to be USD $1,212,089.00 as of December 31, 2011, exclusive of interest.

11. Additionally, plaintiffs seek a full, ongoing accounting from defendants in order to accurately ascertain the exact amount of ongoing, future commissions due and owing to plaintiffs.[1]

---

[1] At a hire rate of $17,000 per day per vessel and a 1.25% commission rate, assuming the hire is paid on all thirteen vessels, plaintiffs would jointly be entitled to $2,016,625.00 in commissions in 2012 and each year going forward, plus commissions under the profit sharing agreement as discussed infra at paragraphs 47 and 74.

## PARTIES

12. At all relevant times hereinafter mentioned, plaintiff ICS was and is a corporation organized and existing under the laws of New York, with an office and place of business in the city of Jersey City, New Jersey.

13. Plaintiff ICS was established in 1957 and operates as shipbrokers, ship managers and transportation consultants. Its services for its international clientele include marketing, voyage calculating, vetting, charterparty negotiation, fixing, charterparty preparation, public relations, bunkering, coordination with various maritime agents, laytime/hire/freight calculation, collection and other post-fixture services.

14. At all relevant times hereinafter mentioned, plaintiff Peraco was and is a corporation organized and existing under the laws of Connecticut, with an office and place of business in Stamford, Connecticut.

15. Plaintiff Peraco was established in 2005 and also operates as shipbrokers, ship managers and transportation consultants, providing services to its international clientele similar to those provided by plaintiff ICS.

16. At all relevant times hereinafter mentioned, defendant Eagle was and is a corporation organized and existing under the laws of the Republic of the Marshall Islands, with an office and principal place of business in New York, New York.

17. Upon information and belief, defendant Eagle, the largest U.S. based owner of Supramax and Handymax vessels, is also the sole owner of all of the issued and outstanding shares of the remaining corporate named defendants herein.

4

18. At all relevant times hereinafter mentioned, defendant Anemi was a Liberian corporation and wholly-owned subsidiary of Kyrini until defendant Eagle's purchase in July 2007, *inter alia*, of Anemi and all of Anemi's assets, including all the issued and outstanding shares of capital stock of Anemi's single purpose corporations.

19. Upon information and belief, the below-named corporate defendants are corporations organized under the laws of the Republic of the Marshall Islands with a registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands, MH96960.

20. Upon information and belief, these corporate defendants are all operating and/or managing companies, as well as wholly-owned subsidiaries and/or affiliates of defendant Eagle:

1. Bittern Shipping LLC ("Owner A"); (M.V. "BITTERN")

2. Kingfisher Shipping LLC ('Owner B"); (M.V. "KINGFISHER")

3. Avocet Shipping LLC ("Owner C"); (M.V. "AVOCET")

4. Crane Shipping LLC ("Owner D"); (M.V. "CRANE")

5. Wren Shipping LLC ("Owner E"); (M.V. "WREN")

6. Jay Shipping LLC ("Owner F"); (M.V. "JAY")

7. Canary Shipping LLC ("Owner G"); (M.V. "CANARY")

8. Martin Shipping LLC ("Owner H"); (M.V. "MARTIN")

9. Thrasher Shipping LLC ("Owner I"); (M.V. "THRASHER")

10. Woodstar Shipping LLC ("Owner J"); (M.V. "WOODSTAR")

11. Nighthawk Shipping LLC ("Owner K"); (M.V. "NIGHTHAWK")

12. Oriole Shipping LLC ("Owner L"); (M.V. "ORIOLE"); and

13. Owl Shipping LLC ("Owner M"); (M.V. "OWL")

The above-named thirteen corporate defendants were the nominated "Owners" under the thirteen subject charters entered into with KLC as "Charterer" having been organized under the laws of the Republic of the Marshall Islands by Eagle and substituted for Anemi's single purpose corporations.[2]

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this dispute by virtue of its general jurisdiction over claims arising out of breach of contract actions. This Court also has subject matter jurisdiction over this dispute by virtue of its supplemental maritime jurisdiction over claims arising out of breach of maritime contract actions.

22. This Court has personal jurisdiction over the defendants pursuant to CPLR 301 since defendants are foreign corporations doing business and located in the State of New York.

23. Venue exists in New York County where Defendant Eagle resides pursuant to CPLR 503(c).

---

[2] Anemi's single purpose corporations

| | | Hull No. | Eagle's single purpose corporations |
|---|---|---|---|
| 1. | Pyrgi Shipping S.A. | DY 3007 | BITTERN Shipping LLC |
| 2. | Agali Shipping S.A. | DY 3022 | KINGFISHER Shipping LLC |
| 3. | Spilia Shipping S.A. | DY 122 | AVOCET Shipping LLC |
| 4. | Kampia Shipping S.A. | DY 3010 | CRANE Shipping LLC |
| 5. | Pelineo Shipping S.A. | DY 121 | WREN Shipping LLC |
| 6. | Sirikari Shipping S.A. | DY 3020 | JAY Shipping LLC |
| 7. | Mesta Shipping S.A. | DY 3009 | CANARY Shipping LLC |
| 8. | Mylos Shipping S.A. | DY 3024 | MARTIN Shipping LLC |
| 9. | Delfini Shipping S.A. | DY 118 | THRASHER Shipping LLC |
| 10. | Kofina Shipping S.A. | DY 115 | WOODSTAR Shipping LLC |
| 11. | Rahi Shipping S.A. | DY 3035 | NIGHTHAWK Shipping LLC |
| 12. | Marmaro Shipping S.A. | DY 3040 | ORIOLE Shipping LLC |
| 13. | Nagos Shipping S.A. | DY 3042 | OWL Shipping LLC |

## BACKGROUND

### Plaintiffs' Prior Relationship/Agreements with Defendant Eagle's predecessor, Anemi Maritime Services, S.A.

24. Both plaintiff ICS and plaintiff Peraco had been retained by Anemi prior to their 2007 retention to perform brokerage services in connection with the subject KLC charterparties herein.

25. Plaintiff ICS commenced its relationship with Anemi in/about 2005.

26. Plaintiff Peraco commenced its relationship with Anemi and with KLC in/about 2006 by way of its long-standing relationship with ICS.

27. Ship brokers do not customarily enter into detailed written brokerage contracts in connection with long-term time charterparties. This is especially true for structured financial packages associated with current and/or future ship building contracts.

28. Typically ship brokers verbally or in writing negotiate a commission rate with an owner or owner's representative, which is then subsequently confirmed in a written exchange.

29. The prior agreement reached between the broker(s) and the party(ies) responsible for the payment of the brokerage commission later typically appears in the actual charterparty entered into between the shipowner and the charterer.

### The Applicable Brokerage Agreements Out of Which Defendants' Duty to Pay Brokerage Commissions to Plaintiffs Arises

30. With respect to the 2007 KLC charters, plaintiffs had verbally negotiated their brokerage commissions with Anemi, and later confirmed their agreed upon commissions in an email exchange as had been the past practice with this client. The May 4, 2007 correspondence confirming plaintiffs' commission rate also reflects that paid to KLC's broker, Overseas Shipping Corporation ("Overseas"), in connection with these same charters. (Exhibit "1" hereto)

31. Prior to plaintiffs' negotiation of their brokerage commissions for the 2007 KLC Charters, plaintiff ICS had typically negotiated a 2% brokerage commission rate with Anemi.

32. With respect to the thirteen KLC Charters, Peraco and Overseas were initially to receive 1.125% each. However, as a result of plaintiffs having persuaded KLC to accept Liberia and the Marshall Islands as acceptable flag states for tax purposes in South Korea and, after plaintiffs had arranged substantial extensions of the charters' durations, Anemi agreed to a 1.25% commission rate for Peraco and Overseas. ICS then modified its commission rate to be commensurate with that of Peraco and Overseas. (*See* Exhibit 1 hereto)

33. Plaintiffs and Anemi typically only negotiated the rate of brokerage commissions and the basis upon which the commissions were to be paid.   As is the custom of the industry, the duration of the commission payments is co-extensive with the duration of the charters themselves.

### The Relevant KLC Charterparties and Vessel Delivery Dates

34. The anticipated charters for the thirteen vessels were reflected in charterparties dated February 1 2007; February 27, 2007; April 17, 2007; and April 23, 2007 as follows:

**February 1, 2007**

Four ships:  M/V WOODSTAR **(J)**– 10/8/08; M/V BITTERN **(A)** 10/20/09; M/V CANARY **(G)** 12/15/09; M/V CRANE **(D)** 1/12/10

8

**February 27, 2007**
Two ships: THRASHER (I)– 1/28/10; AVOCET (C) 2/4/10

**April 17, 2007**
Three ships: JAY (F)– 7/13/10; KINGFISHER (B)– 7/16/10; WREN (E) – 6/21/08

**April 23, 2007 C/P**
Four ships: MARTIN (H) 8/20/10; NIGHTHAWK (K) 2/19/11; ORIOLE (L) 5/20/11; OWL (M) 7/13/11

It was originally anticipated that all of the above charterparties would expire between December 2018 and April 2019.

### Defendant Eagle's July 24, 2007 Stock Purchase Agreement.

35. On July 24, 2007, defendant Eagle entered into a Stock Purchase Agreement (the "Stock Purchase Agreement") with Kyrini for the purchase by Eagle of all of the issued and outstanding shares of capital stock of Anemi and its twenty-five (25) wholly-owned subsidiaries.

36. The purchased entities were various ship-owning companies, the primary assets of twenty-one of which consisted of contracts for the construction of drybulk vessels and options for the construction of additional drybulk vessels (the "construction contracts").   The construction contracts called for the vessels to be delivered between August 2008 and April 2012.[3]

37. As a result of the Stock Purchase Agreement, defendant Eagle acquired the aforementioned assets, as well as the then existing obligations of Anemi and its wholly-owned subsidiaries which were all single purpose corporations, including the rights and obligations of

---

[3] Up until the time of their delivery to Eagle by the Shipyard, the vessels and the construction contracts were assigned hull numbers by the yard. (See, e.g., Exhibit 1.)

the "Owners" in connection with the February 1st , February 27th, April 17th and April 23, 2007 charterparties.

### KLC Bankruptcy Proceedings

38. As a result of adverse market conditions, KLC began experiencing severe financial problems in/about the latter part of 2010, which caused it to default upon its hire payment obligations to defendants under the above-noted KLC charterparties.

39. On January 25, 2011, KLC applied to the Seoul Central District Court for rehabilitation proceedings.  By a Preservation Order dated January 26, 2011 and a Rehabilitation Commencement Order dated February 15, 2011 (the Orders"), the Korean courts approved this request.

40. In order to salvage the then existing KLC Charters, which defendants would have otherwise terminated, plaintiffs, on behalf of defendants and KLC, initiated discussions and conducted negotiations which ultimately resulted in various modifications being made by the defendants to the KLC Charters.

### March 3, 2011 "Master Agreement"

41. These modifications were incorporated into a "Master Agreement" dated March 3, 2011, the effect of which was to modify the underlying KLC Charterparties. As expressly stated in Recital P of the Master Agreement, the Owners and Charterer agreed, and the Receivers approved, various modifications to the subject charter:

"In order to mitigate the losses of the respective Owner and reduce the liabilities of the Charterer under the Charters...This Agreement sets out the terms and conditions upon which the [KLC] Charters shall be affirmed and each of the Charters amended and

10

supplemented." (A copy of the March 3, 2011 Master Agreement is annexed hereto as **Exhibit 4**)

    42. The Master Agreement was drafted as an "Addendum" to the KLC Charters by counsel for defendants and submitted to the Seoul Central District Court for its approval. (*See* Exhibit 4, p. 8)

    43. In pertinent part, the Master Agreement provided that:

a.  From the effective date of the Agreement, the respective Delivered Vessel Charters were treated as affirmed, subject to the terms and conditions of the Master Agreement.[4]

b.  Except as expressly provided in the Master Agreement, no term or condition of the Master Agreement served to relieve KLC from any of its obligations under the KLC Charters.[5]

c.  Charter rates on ten vessels were reduced to $17,000 per vessel per day. KLC is currently responsible for the difference, if any, between $17,000 per vessel per day and the vessels' actual daily earnings. Any such shortfall to be treated as a "claim for common benefit" under the Korean laws of corporate rehabilitation which is to be payable in full.[6]

d.  Through December 31, 2015, defendant Eagle is to receive all profits between $17,000 and $21,000 per vessel per day. Any additional profits over $21,000 per vessel per day are to be divided equally between Eagle and KLC.[7]

---

[4] Master Agreement, clause 2(a).
[5] Master Agreement, Exhibit 4 clause 10.
[6] Master Agreement, Exhibit 4 clause 2(b).
[7] Schedule/Addendum 1, clause 2 (a)(i)(ii).

11

e.  After December 31, 2015, all profits above $17,000 per vessel per day are to be divided equally until the conclusion of the charters, the earliest expiration of which is anticipated to be December 31, 2018.[8]

f.  The time-charter rates on the new buildings still to be delivered to KLC have also been adjusted to $17,000 per vessel per day with the same terms to be applicable on delivery as applicable to the previously delivered vessels.   As with the other delivered vessels, KLC is responsible for any difference between $17,000 per vessel per day and the vessels' actual daily earnings, such shortfall also being treated as a "claim for common benefit" under the Korean laws of corporate Rehabilitation, payable in full.

g.  The charter on one other vessel (M/V WOODSTAR (Charter J)), having been subchartered  prior to the Master Agreement at the rate of $25,000 per day with a remaining balance of charter of about 3.5 years, was not to be affected by the Master Agreement.[9]

h.  Charter J was "affirmed without amendment or variation", subject to KLC's right, upon termination of the vessel sub-charter, to declare that the charter be affirmed on the same basis and terms as the other Delivered Vessel Charters.[10]

i.  No term of the Master Agreement is to be "enforceable under the terms of the Contracts (Rights of Third Parties) Act 1999 by a person who is not a party" to the Master Agreement.[11]

---

[8] Schedule/Addendum 1, clause 2(b).
[9] Master Agreement, Recital O Exhibit 4 at 4, para. O
[10] In/about October, 2011, due to the failure of the sub-charterer to perform, KLC terminated the sub-charter and Eagle took over the employment of this vessel  which was then subject to the same charter rate and terms applicable to the other ten vessels.

### March 3, 2011 Schedule/Addendum 1 to Charters

44. Another Addendum to the charters, denominated "Schedule 1", was also entered into on March 3, 2011 between each owning company and the Joint Receivers of KLC, which, by its terms, further amended and supplemented the KLC Charters. (A copy of the March 3, 2011 Schedule/Addendum 1 is attached hereto as **Exhibit 5**)

45. In pertinent part, Schedule 1, which was also executed on behalf of each of the owning companies and the Joint Receivers of KLC, provided for both a profit sharing agreement and what was inaccurately denominated as a "Suspension Period."

46. With respect to the profit sharing agreement, the 2.5% address commission which was reflected in certain of the charterparties, and was payable to KLC, has been permanently eliminated and is now payable to Owners at the rate of 2.5% on all gross earnings during the so-called Suspension Period.[12]

47. Brokerage commissions are to be payable under the profit sharing agreement as follows: "1.25% Overseas Shipping Corporation, Seoul, and 1.25% to Peraco Chartering (USA) LLC plus 1.25% to International Chartering Services, Inc. in addition to the hire payable under the Charter."[13]

48. The "Suspension Period" was defined as:

---

[11] Master Agreement Exhibit 4, clause 14.
[12] In December 2011, the Owners' address commission was reduced to 1.25%.
[13] Schedule/Addendum 1, p. 2, clause 2(h)

> "an interim period ...of about twelve (12) months, plus or minus 3 months in the Owners' option, or such other period as is mutually agreed, from the Relevant Date with any further extensions of the Suspension Period in the Owners' option"

during which time, *inter alia*, KLC's daily hire obligation remained at the agreed hire rate of $17,000 per day. This rate also remains in effect for the duration of the charters. [14]    As a result, defendant Eagle is guaranteed earnings in the amount reflected in the modified charterparties.

49. The obligation to pay hire was, thus, not actually "suspended," but merely reduced to the payment of the differential amounts as set forth in the Master Agreement and described herein at paragraph 43. [15]

50. The Suspension Period was to be determined when the vessels became ready for delivery to the Charterers. [16]

51. The duration of the KLC Charters were not to be extended by the length of the Suspension Period. [17]

52. The various KLC Charters were to remain in full force and effect but, from the date of Schedule 1, were to be "amended and supplemented" subject to the amendments of Schedule 1 as well as the Master Agreement. [18]

53. On March 15, 2011, Eagle commenced assumption of responsibility for the employment of the chartered vessels affected by the rehabilitation proceedings, the March 3, 2011 Master Agreement, and the March 3, 2011 Schedule/Addendum 1 to the KLC Charters.

54. By September 30, 2011, Eagle had assumed responsibility for the employment of all of the affected chartered vessels, having re-chartered them out at various times on the spot

---

[14] Schedule/Addendum 1, p. 2, clause 3, 3(1)
[15] Schedule/Addendum 1, p. 2-3, clauses 3(1),(4)
[16] Schedule/Addendum 1, p.3, clause 3(5)
[17] Schedule/Addendum 1, p.3, clause 4
[18] Schedule/Addendum 1, p. 1, Recital B.

and short-term time charter markets under terms approved by the Korean Court. Vessel earnings were and continue to be used to offset the charter hire otherwise due from KLC who continues to remain responsible for the differential hire as stated in paragraph 43 herein.

### FIRST CAUSE OF ACTION
### (Breach of Contract)

55.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 54 as if set forth in full herein.

56. On or about January 27, 2011, plaintiffs, along with two representatives of defendant Eagle, Mr. Alexi Zoullas and Mr. Alan Ginsberg, met with Mr. Jae-Min Park of KLC for the purpose of obtaining information regarding KLC's intentions and prospects in relation to its defaults in hire payments under the various KLC charters.

### Plaintiffs' Contributions to the Modified KLC Charters

57. During the January 2011 meetings in South Korea, plaintiffs conducted discussions directly with both KLC and Overseas, persuading the former to do what was necessary to maintain the charters and the relationship ICS and Peraco had established between KLC and defendant Owners.

58. As a result of plaintiffs' success in this regard, defendant Owners were dissuaded from terminating the KLC Charters, which they otherwise would have done in order not to have the ships remain idle during the rehabilitation proceedings.

59.  Messrs. Zoullas and Ginsberg, on behalf of defendants, returned to South Korea on/about February 8, 2011 with defendants' counsel, Charles Weller of Reed Smith of London.

15

60. Plaintiffs were not in attendance during this second visit and neither Messrs. Zoullas and Ginsberg nor defendants' counsel were able to achieve a resolution to the continuing problem of KLC's financial condition and inability to meet its hire obligations under the KLC Charters.

61. Thereafter, as a result of plaintiffs' renewed and persistent efforts, Owners were persuaded to resume the negotiations with plaintiffs' assistance, which ultimately salvaged the KLC Charters and provided Owners with numerous financial and commercial advantages.

62. More specifically, plaintiffs initiated the idea of a third round of meetings and, after great effort, convinced Owners to attend and work out with KLC and its Receivers modifications to the KLC Charters which were embodied in the Master Agreement and Schedule 1 described above at paragraphs 41-54.

63. At Owners' request, plaintiffs visited the New York offices of defendant Eagle at the end of February and devised a strategy and agenda for a third set of meetings in South Korea which plaintiffs also attended along with defendant Eagle and KLC. Plaintiffs continued to work not only with Owners on the various draft agreements, but also successfully worked directly with KLC and Overseas to ensure that the latter would be responsive to the proposals being made, providing significant input into the substance thereof.

64. The successful results achieved were, in large part, attributable to KLC's complete faith and trust in ICS/Peraco which had been developed prior to defendant Eagle's purchase of the assets of Anemi, including its twenty-five vessel-owning companies.

65. But for the efforts of plaintiffs, there would have been no modified contractual arrangement concluded between defendant Owners and KLC. Like other ship owners,

defendant Owners would have had to file their claims with the Bankruptcy Court which, in turn, would likely have resulted in their obtaining minimal payments in cash and stock.

66. Due to the persistent and skillful efforts of ICS and Peraco, Owners' situation today is far superior to that of many other ship owners who were prepared to accept KLC's proposed rate of only USD 16,000/day.

67. The difference in outcomes is directly attributable to all of the time and effort expended by plaintiffs in concluding these contractual modifications, as well as the excellent relationship plaintiffs worked diligently to establish between KLC and Owners both prior to and following Eagle's 2007 purchase of Anemi and the owning companies.

## Defendants' Refusal to Continue the Payment of Commissions to Plaintiffs

68. Notwithstanding all of the time and effort expended by plaintiffs, in addition to the successful results achieved, in/about mid-December 2011, plaintiffs were advised by defendant Eagle (Mr. Alexis Zoullas) that defendant Eagle would be discontinuing plaintiffs' commissions during the "suspension period."

69. No term of the Master Agreement or Schedule 1 "suspends" KLC's obligation to pay hire. Rather, the Master Agreement and Schedule 1, as set forth above herein at paragraph 43, merely reduce the quantum of hire for which KLC is responsible under the charters.

70. Similarly, no term of the Master Agreement "suspends" Owners' obligation to pay brokerage commissions on the hire earned and paid on KLC's guaranteed $17,000/day hire payment to defendants during the "Suspension Period" regardless of whether these sums are paid by KLC and/or by third-party charterers.

17

71. In fact, nowhere in the Master Agreement or Schedule 1 is the commission of Plaintiffs Peraco and ICS on "hire earned and paid" under the KLC Charters modified, much less "suspended."

72. Owners' continuing obligation to pay brokerage commissions to plaintiffs is clearly evidenced by the continued payment of brokerage commissions during the suspension period to Overseas and Owners' acknowledgment that plaintiffs' commissions are "billable to owners." (*See* copies of two examples of defendant Eagle's hire invoices reflecting payments of commissions to plaintiffs as "billable to owners" attached hereto as **Exhibit 6.**)

73. Rather than terminating the KLC Charterparties, the Master Agreement and Schedule 1 merely modified certain of the terms, leaving those unaddressed intact.

74. The profit sharing agreement (Clause 2 (h) of Schedule 1) expressly preserves plaintiffs' rights to brokerage commissions on any sums due pertinent to the profit sharing agreement "*in addition to hire payable under the Charter.*"

75. The terms of the KLC Charters, in turn, as noted at page 3 of Schedule 1 remain "in full force and effect" to the extent that the Master Agreement does not "amend or supplement" their terms.

76. Plaintiffs have not only fulfilled all of their obligations with respect to the services required of them, but have gone above and beyond same to preserve these charters which would otherwise have been terminated by defendant owners.

77. Despite plaintiffs' efforts, defendants have failed and/or refused to honor their contractual obligations to plaintiffs with respect to the brokerage commissions now due and owing, and have anticipatorily breached the brokerage agreements with respect to those commissions which will continue to accrue.

78. As a result of defendants' breach of their obligations, defendants are indebted to plaintiffs, as accurately as can be ascertained to date, in the sum of USD $1,212,089.00, plus interest, no part of which has been paid although duly demanded.

**SECOND CAUSE OF ACTION**
**(Breach of a Maritime Contract)**

79.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 78 as if set forth in full herein.

80. In the alternative to plaintiff's breach of contract claim, as set forth in the First Cause of Action herein, plaintiffs are entitled to recovery by virtue of defendants' breach of a maritime contract.

81. As shipping consultants, as well as brokers working for defendants and KLC on the aforementioned charterparties, plaintiffs provided both maritime and non-maritime services to defendants, both prior to, during, and following the finalization of the charterparties.

82. Pursuant to their brokerage agreements with first Anemi and then defendant Eagle following its purchase of Anemi and all of its assets, plaintiffs performed the below-listed services.

83. Plaintiffs' services, however, were not limited to the standard services performed by brokers on behalf of their principals. Plaintiffs also provided services over and above those typically performed by brokers:

     a) In the absence of a chartering department, plaintiffs drafted for Anemi all required modifications to the printed time charterparty form, as well as all "additional" clauses (e.g., cargo and geographical trading exclusions, duration, extension, and cancelling clauses) in 2007;

     b) Drafted and then negotiated with KLC clauses identifying dirty/deleterious cargos, the maximum number of permissible voyages per year, as well as

19

notice and cleaning provisions, all of which were critical in obtaining long-term charterparties and extensions;

c) Drafted and negotiated with KLC dry-docking clauses which were favorable to Owners;

d) Facilitated the transfer/novation of the new building contracts/charterparties from Anemi to Eagle, suggesting and making all necessary changes;

e) Negotiated the charterparty addenda between Defendant Eagle and KLC, and coordinated vessel delivery dates with the shipyard, KLC, and various financial institutions;

f) Coordinated with Eagle's onsite shipyard team and technical department accurate and agreed speed and consumption warranties for inclusion in the charterparties as the vessels were delivered;

g) Compiled specifications for Eagle to be included in the description clauses of each individual charterparty, including those for cranes and grabs which are critical for chartering purposes;

h) Negotiated with KLC on behalf of Eagle to take delivery of the M/V "WOODSTAR" without grabs despite a charterparty stipulation to the contrary, thus enabling delivery of the vessel months earlier than would otherwise have been the case;

i) Obtained an automatic extension with the shipyard for up to 20-30 days of the agreed laydays and negotiated an automatic extension of the cancelling date for Eagle, which was applied to subsequent ships, thus preventing the cancellation of at least one vessel;

j) At the request of both defendant Eagle and KLC, assisted with both technical and operational issues which arose following vessel deliveries;

k) Worked to see that hire payments were made promptly and that Eagle received preferential hire payments from KLC throughout the duration of the charterparties;

l) Kept track of all notices and advised defendant Eagle of same;

m) Expedited the discharge of cargo via letters of indemnity;

n) Worked with the operations department of Eagle to provide timely narrowing of laydays for delivery into the charterparties and the avoidance of cancellations;

o) Worked with KLC and Eagle's insurance department to investigate and settle where possible various cargo damage claims;

p) Worked with Eagle's operations department to ensure that all speed claims were properly documented;

q) Vetted questionnaires for completeness and accuracy communicating all modifications to all concerned;

r) Acted as a liaison between KLC and Eagle regarding the safe and expeditious loading or discharging of cargo while at anchorage;

s) Prepared additional addenda upon delivery of each vessel, detailing owners style, other unique characteristics of the vessel, banking details, and other items necessary to complete the delivery of the vessel into the charterparty;

t) Passed and commented upon voyage instructions regarding upcoming voyages from KLC or their subcharterers to Eagle and the vessels which expedited the voyages. Supplemented the information that would be required to have the vessels operate within the KLC operating system.

u) On delivery coordinated the delivery quantities and grades of bunkers to Eagle and the vessel. Advised KLC well in advance to assure that there were sufficient bunkers to perform the initial voyages of the vessel after delivery from the builder's yard.

v) Coordinated discussions between KLC and Eagle regarding the optimal rpm's of the main engine to reduce fuel consumption and make the voyages more economical.

w) Advised KLC regarding proper stowages to ensure safe and timely voyages.

x) Took various measures to expedite the carriage, loading and discharging of the cargo, including matching the actual condition of the holds with the requirements of the charterer/cargo interests.

y) Negotiated the addition to the trading and cargo exclusions of a 'bimco piracy clause' which allowed the vessel to trade in more profitable areas. Coordinated the payment to the Owners by the Charterer of additional war risk premiums.

84. In consideration of these and the additional above-described services, plaintiffs were to be paid ongoing commissions based upon the hire earned and paid throughout the duration of charters and any extensions thereof.

85. Defendant Eagle made payments due to plaintiffs at various times on the various charters beginning in 2008 until their initial breach in/about December 2011. (Copies of printouts for commissions actually received by plaintiffs ICS and Peraco on each vessel to date are attached hereto as **Exhibits 7 and 8,** respectively.)

86. As evidenced by the nature of many of the aforementioned services plaintiffs performed under the brokerage agreements, said agreements were maritime contracts.

87. Plaintiffs have fulfilled all of their obligations pursuant to the brokerage agreements.

88. In spite of plaintiffs' performance of their obligations thereunder, defendants have failed and/or refused to honor their obligations to plaintiffs.

89. Defendants' breach of their obligations under the brokerage agreements constitute a breach of a maritime contract.

90. This Court can exercise its supplemental maritime jurisdiction to hear plaintiffs' claim for the breach of a maritime contract.

91. In addition to the writings which memorialize the existence of an oral agreement between Anemi and plaintiffs, the last of which is attached hereto as Exhibit 1, defendants have acknowledged the existence of plaintiffs' prior brokerage agreement with Anemi and their liability for same in connection with the July 2007 Stock Purchase Agreement, by their subsequent payment of brokerage commissions to plaintiffs as reflected in paragraph 6 supra and Exhibits 2 and 3 hereto.

22

92. Defendants have refused to honor the terms of plaintiffs' brokerage agreement and have thus breached the maritime contract between the parties.

93. As a result of defendants' breach, defendants are indebted to plaintiffs, as accurately as can be ascertained to date, in the amount of $1,212,089.00, exclusive of accrued interest

### THIRD CAUSE OF ACTION
### (Willful Frustration of Contract)

94. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 93 as if set forth in full herein.

95. As set forth in the First and Second Causes of Action herein, the brokerage agreements governing this dispute required plaintiffs to perform certain services for which plaintiffs are entitled to commissions.

96. Defendants induced plaintiffs to perform their obligations under the agreement, with both the express and implied understanding that plaintiffs would be compensated accordingly.

97. Thereafter, defendants willfully, wantonly and maliciously breached the brokerage agreements with plaintiffs.

98. At the same time that defendants were requesting and utilizing plaintiffs' continued performance of their obligations, defendants knowingly intended to breach those agreements.

99. Defendants' conduct was deliberate, and evinces a wanton and malicious disregard of plaintiffs' rights, and an intention to cause plaintiffs the harm which, in fact, resulted.

23

100. As a consequence of defendants' willful, wanton, and malicious conduct in breaching their agreements with plaintiffs, plaintiffs have suffered damages, as accurately as can be ascertained to date, in the principal sum of US$ 1,212,089.00, exclusive of accrued interest.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

101. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 100 as if set forth in full herein.

102. At the time Defendant Eagle entered into the Stock Purchase Agreement with Kyrini in July 2007, it acquired all of the rights and obligations of the Purchased Entities, including those reflected in the KLC charterparties.

103. The brokerage commissions payable to plaintiffs in connection with the KLC charters, pursuant to plaintiffs' agreement with Anemi, were among the obligations which Defendant Eagle undertook when it entered into the Stock Purchase Agreement with Kyrini.

104. Plaintiffs' services were not gratuitously rendered, but rather, as evidenced by Defendant Eagle's payment of same, plaintiffs rightfully expected, were entitled to, and did, in fact, until January 2011, receive from defendant Eagle commissions for the brokerage services provided to defendants.

105. Exhibit 6 attached hereto, reflects defendant Eagle's recent acknowledgement of defendants' continuing obligation to plaintiffs for the services which plaintiff performed on defendants' behalf, in connection with the KLC charters.

24

106. Despite defendant Eagle's agreement and obligation to compensate plaintiffs for the services which plaintiffs performed on defendants' behalf, defendants have refused to honor their obligations to plaintiffs.

107. Additionally, as a result of the 1.25% address commission no longer being paid to KLC, the 1.25% address commission Owners are taking for themselves, and the 1.25% commission wrongfully not being paid to either plaintiff ICS or plaintiff Peraco, defendants have unjustly enriched themselves overall by 2.5% of the amounts earned and paid under the charters.

108. As a result of the foregoing, defendants' have been unjustly enriched to date, as accurately as can be ascertained to date, in the amount of $1,212,089.00, exclusive of accrued interest.

## FIFTH CAUSE OF ACTION
### (Accounting)

109. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 108 as if set forth in full herein.

110. Defendant Eagle has in its possession or control money belonging to plaintiffs. In spite of Defendant Eagle's contractual obligations, it has failed to disclose such amounts received or to make a complete accounting thereof to plaintiffs.

111. By reason of the foregoing, plaintiffs have been damaged and denied monies due plaintiffs, but are unable to specify the amounts due until defendants have made a full and proper accounting of all monies earned and paid.

**WHEREFORE,** plaintiffs, International Chartering Services, Inc. and Peraco Chartering (USA) LLC, demand:

1.   A declaratory judgment that defendants are liable for commissions payable under the brokerage agreements entered into initially with Anemi Maritime Services which were subsequently acquired by Eagle Bulk Shipping Inc. as set forth in plaintiffs' First Cause of Action;

2.   Judgment against defendants for direct damages incurred and yet to be incurred in connection with the First, Second and Third Causes of Action, presently estimated to be approximately, $1,212,089.00, plus interest;

3.   Alternatively, judgment against defendants for having been unjustly enriched in the approximate amount of $1,212,089.00 in connection with the Fourth Cause of Action;

4.   That the Court direct defendants to give a full accounting to plaintiffs, as requested in connection with the Fifth Cause of Action; and

5.   That the Court grant such further relief as may be appropriate and just, together with the costs and disbursements of this action.

Dated:     New York, New York
           April 13, 2012

                              Yours, etc.,

                              KEANE & MARLOWE

                              By: _____
                                  Christopher P. Keane
                                  Mary Ann C. Marlowe
                                  Attorneys for Plaintiffs
                                  International Chartering Services, Inc.
                                  and Peraco Chartering (USA) LLC
                                  197 Route 18 South, Suite 3000
                                  East Brunswick, NJ 08816
                                  (732) 951-8300

                                  245 Park Avenue, 39th Floor
                                  New York, New York 10167
                                  (212) 572-6210

26