EXHIBIT B

# FIRST ORIGINAL

## Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

International Chartering Services, Inc.
525 Washington Blvd. - Suite 2407
Jersey City, New Jersey 07310
Phone: 201-604 -8585/Fax: 201-604-8586
IMAIL: ics@infreco.com

1   *I.C.S. #004-07*

**This Charter Party,** made and concluded in *Jersey City, New Jersey* .................................... 1st day of *February, 2007* ............ 19.....

2   Between *Owning Companies as designated by ANEMI MARITIME SERVICES but understood Owners not to be domiciled in Marshall Islands, Labuan, Liberia, Monaco, Andora or Liechtenstein*

3   Owners of the good ...................... Steamship/Motorship *M/V "TO BE NOMINATED" - See description as per Clause #29* of .......

4   of........................tons gross register, and......................tons net register, having engines of.............................indicated horse power

5   and with hull, machinery and equipment in a thoroughly efficient state, and classed...............................................................................

6   at..........................of about....................cubic feet bale capacity, and about...............................tons of 2240 lbs.

7   deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity,

8   allowing a minimum of fifty tons) on a draft of.............feet...............inches on.......................Summer freeboard, inclusive of permanent bunkers,

9   which are of the capacity of about..............................................tons of fuel, and capable of steaming, fully laden, under good weather

10   conditions about......................knots on a consumption of about.......................tons of best Welch coal—best grade fuel oil—best grade Diesel oil,

11   now .........................................................................................................................................................................................................

12   .............and *KOREA LINE CORPORATION* ................................................ Charterers of the City of *Seoul, Korea*

13   **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14   about a period of *five (5) years plus or minus 3 months in Charterers' option trading via safe port(s), safe berth(s), safe*

15   *anchorage(s) always afloat (except for Clauses #6 and #99) and always within IWL (except for Clause #76) with*
   *lawful/harmless cargoes* within below mentioned trading limits.

16   Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17   the fulfillment of this Charter Party. *The minimum duration of 1735 days is guaranteed and payable by Charterers.*

18   Vessel to be placed at the disposal of the Charterers, at *upon sailing from Builder's Yard in China any time day or night Sundays and*

19   *holidays included. If the Vessel is not delivered upon sailing from Builder's dock or in Charterers' option to accept delivery*
   *upon sailing from Builder's dock with less than 60 day interval or 30 day interval on the last Vessel but Charterers to advise*
   *Owners within 3 business days of receipt that interval cannot be maintained as per Clause #113.*

20   In such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as

21   the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on *arrival at first load port her*
   *delivery to be*

22   ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast, *cranes* winches and

23   donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the *cranes* winches at one and the same

24   time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25   dise, including petroleum or its products, in proper containers excluding *See Clause #51* ...................................................................................

26   (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27   all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

28   America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico,

29   Mexico, and/or South America.......................................................................................................................................and/or Europe

30   and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31   October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,

32   *See Clause #52 - Trading Exclusions*

33   ...........................................................................................................................................................................................................

34   ...........................................................................................................................................................................................................

35   as the Charterers or their Agents shall direct, on the following conditions:

36   1.   That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the

37   insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including *drinking water, lubricating oil and garbage*
   *due, if not compulsory,* boiler water and maintain her class and keep

38   the vessel in a thoroughly efficient state in hull, machinery and equipment *with inspection necessary to comply with current requirements at*
   *ports of call and canals* for and during the service. *It is understood that if any extra documents other than usual trading certificates*
   *to meet special and specific requirements are required, in a particular port or private terminal, same to be for Charterers'*
   *account including but not limited to additional mooring lines which to be arranged for and paid by Charterers.  Vessel is fitted*
   *with 12 mooring lines of 220 Meters each.*

39   2.   That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and customary*
   Pilotages *including Japanese inland sea including Bungo Channel, Dardanelles Strait, Bosporus Strait, Skaw/Spodsbjerg (Great*
   *Belt) and Strait of Magellan, Boatage on Charterers' business,* Agencies *for Charterers' business,* clearance and cargo purposes
   *only,* Commissions,

40   Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

41   a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42   illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried *and/or cargoes intended to be carried,* or ports visited

43  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44  of six months or more.
45  Charterers are to provide necessary dunnage *Shippers to submit to Master Phyto-Sanitary Certificate of Dunnage, issued by local authority, prior departure failing which Charterers shall remain responsible for any consequences in U.S.A. or other authority's fines/delays,* and shifting boards *and material,* also any extra fittings requisite for a special trade or unusual cargo, but Owners to allow them the use of any dunnage, *lashing materials as on board* and shifting boards already aboard vessel. Charterers to have the privilege of
46  using shifting boards
47  for dunnage, they making good any damage thereto.
48  3.   That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
49  board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ............................................tons and not more than
50  ..........................................tons and to be re-delivered with not less than ............................tons and not more than ........................tons. *See Clause #61.*
51  4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of *for 53,100 Metric Ton Type U.S. $18,300.00 daily ...........*
52  *including overtime, for 57,000 Metric Ton Type U.S. $18,850.00 daily including overtime payable 30 days in advance* United States Currency *or pro rata for any part of a day* per ton on vessel's total deadweight carrying capacity, including bunkers and
53  stores, on ............................................................summer freeboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at
54  and after the same rate for any part of a month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) *at on dropping last outbound sea pilot/passing one (1) safe port in Charterers' option*
56  *Aden/Japan Range or in Charterers' option Skaw-Passero Range or in Charterers' option Montreal/Buenos Aires Range or in Charterers' option Vancouver/Antofagasta Range any time day or night Sundays and holidays included* unless otherwise mutually agreed. Charterers are to give Owners not less than *30/20/15/10/5 days approximate – all going well except unforeseen circumstances including but not limited to change of berthing turns at port of discharge-*
57  notice of vessels expected date of re-delivery, and *15 days minimum redelivery notice/port and definite* probable port *and definite redelivery notice 5/3/1 day(s) before redelivery.*
58  5.   Payment of said hire to be made *as per Clause #89* in New York in cash in United States Currency, *30 days* semi-monthly in advance, and for the last *30 days* half-month or
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
63  following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they
64  to have the privilege of using vessel at once, such time used to count as hire.
65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67  of such advances.
68  6.   That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place or *safe anchorage* that Charterers or their Agents may
69  direct *no ship to ship transfer allowed,* provided the vessel can safely lie always afloat at any time of tide *at ice free ports and berths,* except at such places *in Buenaventura, Colombia, Brazil and Argentina, River Plate including Upriver, Uruguay only* where it is customary for similar size vessels to safely
70  lie aground. *See Clause #99. Vessel to be left in safe seaworthy trim between berths/ports to Master's satisfaction.*
71  7.   That the whole reach of the Vessel's Hold, Decks *(no deck cargo) (See Clause #51),* and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers
74  paying Owners ............................................per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are
75  incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.
76  8.   That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency; and Charterers are to load, stow, *tally* and trim *secure and discharge (including extracting the cargo to a readily accessible point)* the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for
79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *Charterers not to issue any liner terms Bills of Lading, through Bills of Lading, and no trans-shipment allowed.*
80  9.   That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82  10.  That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of $12.00 per day *for supercargo.* Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85  Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. *If Charterers decide to embark a supercargo he is to sign Owners' standard form of waiver before embarking the Vessel (wording can be made available if required).*
86  11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
89  sumption of fuel.
90  12.  That the Captain shall use diligence in caring for the ventilation of the cargo.
91  13.  That the Charterers shall have the option of continuing this charter for a further period of...........................................................................
92  .........................................................................................................................................................................................
93  on giving written notice thereof to the Owners or their Agents ..........................................days previous to the expiration of the first-named term, or any declared option.
94  14.  That if required by Charterers, time not to commence before *See Clause #113* ......................................................... and should vessel



95 not have *delivered* ~~given written notice of readiness~~ on or before *See Clause #113* ........................................ ~~but not later than 4 p.m.~~ Charterers or

96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness *as per Clause 113 Baltime Cancelling Clause.*

97  15.  That in the event of the loss of time from deficiency *and/or default* of men *including strikes of officers and crew whether due to labor disputes or otherwise, deficiency of* ~~or~~ stores, fire, breakdown or damages to hull, machinery or equipment,

98  ~~grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause~~

99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101 thereof, and all extra *directly related* expenses shall be deducted from the hire. *Charterers giving full credit for any fuel or expenses saved in consequence of such reductions of speed.*

102  16.  That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106 purpose of saving life and property.

107  17.  That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London* ~~New York~~ *with minimum 13 months time bar,*

108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for

109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping men. This Charter Party shall be governed by the English Law. It is agreed that claims below U.S. $50,000.00 excluding interest and cost shall be conducted by a sole arbitrator and shall be conducted in accordance with LMAA Small Claims Procedure 1989 and any amendments thereto.*

110  18.  That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-

111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113 might have priority over the title and interest of the owners in the vessel. *In no event shall Charterers procure, or permit to be procured for the Vessel, any supplies, necessaries or services without previously obtaining a statement signed by an authorized representative of the furnisher thereof, acknowledging that such supplies, necessaries or services are being furnished on the credit of Charterers and not on the credit of the Vessel or of her Owners, and that the furnished claims no maritime lien on the vessel therefore.*

114  19.  That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115 Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, ~~and Rule F of~~

116 *York-Antwerp Rules 1994 or any amendments thereto* ~~1924, at such part or place in the United States~~ as may be selected by the carrier, and as to matters not provided for by these

117 ~~Rules, according to the laws and usages at the port of~~ *London* ~~New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~

118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~

119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~

121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~

124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~

125 ~~United States money.~~

126 ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~

127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

131 ~~ships belonged to strangers.~~ *Charter hire not to contribute to General Average.*

132  Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133  20.  Fuel used by the vessel while off hire, also ~~for cooking, condensing water, or for grates and stoves~~ to be agreed as to quantity, and the

134 cost of replacing same, to be allowed by Owners. *Bunkers consumed during off-hire to be for Owners' account at Platt's nearest posted prices but maximum agreed Charter Party prices.*

135  21.  ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~

136 ~~convenient place, bottom cleaned and painted whenever Charterers think necessary, at least once in every six months, reckoning from~~

137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

138 *See Clause #58.*

139

140  22.  Owners shall maintain the gear of the ship as fitted, providing gear (for all *cranes* derricks) capable of handling lifts *as per Clause #29* ~~up to three tons,~~ also

141 providing ropes, falls, slings and blocks *as on board.* If vessel is fitted with *cranes* derricks capable of handling heavier lifts, Owners are to provide necessary gear for

142 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *sufficient lights as on board* ~~lanterns and oil for~~

143 night work *free of expense to the Charterers,* ~~and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The

144 Charterers to have the use of any gear *including grabs* on board the vessel.

145  23.  Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;

146 *See Clause #29* ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~

winchmen,

147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterer. In the event of a disabled winch or winches, or~~
149 insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150 thereby.

151 ~~24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder:~~

155

156 ~~U.S.A. Clause Paramount~~
157 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
158 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
159 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
160 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

161 ~~Both-to-Blame Collision Clause~~
162 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
163 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
164 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owner in so far as such loss~~
165 ~~or liability represents loss of or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
166 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
   ~~owners as part of their claim against the carrying ship or carrier.~~

167 25.   The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
9 port or to get out after having completed loading or discharging. *Vessel not to force ice, nor follow ice breakers and always understood that Vessel not to trade in ice.*

170 26.   Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, *acts of pilots and tugboats*, insurance, crew, and all other matters, same as when trading for their own account.

172 27.   A commission of ~~2 1/2~~ *1.25%* per cent is payable by the Vessel and Owners to *Overseas Shipping Corporation, Seoul and 1.25% to*
173 *Peraco Chartering (USA) LLC plus 1.25% to International Chartering Services, Inc.* ..................................................................
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175 28.   An address commission of *1.25* ~~2 1/2~~ per cent payable to *Charterers* .......................................... on the hire earned and paid under this Charter.

*Riders Clauses 29 through 120, both inclusive, as attached to form part of this Charter Party.*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

KOREA LINE CORPORATION
SEOUL, KOREA

For and on behalf of Owning Companies,
as designated by ANEMI MARITIME SERVICES
as per authority dated June 11th, 200
International Chartering Services, Inc.
as Brokers only

JAE - MIN PARK
EXECUTIVE VICE PRESIDENT
BUSINESS DIVISION

JAMES J. HAMMOND

# FIRST ORIGINAL
## Time Charter

**GOVERNMENT FORM**

*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

I.C.S. #008-07

1   **This Charter Party,** made and concluded in Jersey City, New Jersey.........................27th day of February, 2007 ...............19......

2   Between **Owning Companies as designated by ANEMI MARITIME SERVICES but understood Owners not to be domiciled in**
**Marshall Islands, Labuan, Liberia, Monaco, Andora or Liechtenstein**

3   Owners of the good .........................Steamship/Motorship **M/V "TO BE NOMINATED" - See description as per Clause #29 of**

4   of..........................tons gross register, and..........................tons net register, having engines of..........................indicated horse power

5   and with hull, machinery and equipment in a thoroughly efficient state, and classed..........................

6   at..........................of about..........................cubic feet bale capacity, and about..........................tons of 2240 lbs.

7   deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity,

8   allowing a minimum of fifty tons) on a draft of..........................feet..........................inches on..........................Summer freeboard, inclusive of permanent bunkers,

9   which are of the capacity of about..........................tons of fuel, and capable of steaming, fully laden, under good weather

10   conditions about..........................knots on a consumption of about..........................tons of best Welch coal - best grade fuel oil - best grade Diesel oil,

11   now in..........................Charters of the City of **Seoul, Korea**

12   ..........................and **KOREA LINE CORPORATION** ..........................Charterers of the City of **Seoul, Korea**

13   **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14   about **a period of minimum 57 Months/maximum 75 Months in Charterers' option. The period over 63 Months (5 years 3**

15   **months) to be declared by Charterers 60 days prior to expiration of 63 Months (5 years 3 months), trading via safe port(s), safe**
**berth(s), safe anchorage(s) always afloat (except for Clauses #6 and #99) and always within IWL (except for Clause #76) with**
**lawful/harmless cargoes** ..........................within/below mentioned trading limits,

16   Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17   the fulfillment of this Charter Party. **The minimum duration of 1735 days is guaranteed and payable by Charterers.**

18   Vessel to be placed at the disposal of the Charterers, at **upon sailing from Builder's Yard in China any time day or night Sundays and**

19   **holidays included.**

20   In such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as

21   the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on **arrival at first load port** has
delivery to be

22   ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast, **cranes** winches and

23   donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the **cranes** winches at one and the same

24   time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25   dise, including petroleum or its products, in proper containers excluding **See Clause #51**

26   (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27   all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

28   America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29   Mexico, and/or South America ..........................and/or Europe

30   and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31   October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,

32   **See Clause #52 - Trading Exclusions**

33

34

35   as the Charterers or their Agents shall direct, on the following conditions:

36   1.   That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the

37   insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including **drinking water, lubricating oil and garbage**
**due, if not compulsory,** boiler water and maintain her class and keep

38   the vessel in a thoroughly efficient state in hull, machinery and equipment **with inspection necessary to comply with current requirements at**
**ports of call and canals for and during the service. It is understood that if any extra documents other than usual trading certificates**
**to meet special and specific requirements are required, in a particular port or private terminal, same to be for Charterers'**
**account including but not limited to additional mooring lines which to be arranged for and paid by Charterers.  Vessel is fitted**
**with 12 mooring lines of 220 Meters each.**

39   2.   That **whilst on hire** the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, **compulsory and customary**
**Pilotage including Japanese inland sea including Bungo Channel, Dardanelles Strait, Bosporus Strait, Skaw/Spodsbjerg (Great**
**Belt) and Strait of Magellan, Boatage on Charterers' business,** Agencies for Charterers' business, clearance and cargo purposes
**only,** Commissions,

40   Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

41   a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42   illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried **and/or cargoes intended to be carried,** or ports visited
while vessel is employed under this

International Chartering Services, Inc.
525 Washington Blvd. - Suite 2407
Jersey City, New Jersey  07310
Phone: 201-604-8585/Fax: 201-604-8586
IMAIL: ics@infreco.com

43  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44  of six months or more.

45      Charterers are to provide necessary dunnage. *Shippers to submit to Master Phyto-Sanitary Certificate of Dunnage, issued by local authority, prior departure failing which Charterers remain responsible for any consequences in U.S.A. or other authority's fines/delays,* and shifting boards *and material,* also any extra fittings requisite for a special trade or unusual cargo, but
46  Owners to allow them the use of any dunnage, *lashing materials as on board* and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47  for dunnage, they making good any damage thereto.

48      3.  That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
49  board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ................tons and not more than ................
50  ................tons and to be re-delivered with not less than ................tons and not more than ................tons. *See Clause #61.*

51      4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of *U.S. $18,400.00 daily for either size vessel including*
52  *overtime payable 30 days in advance* United States Currency *or pro rata for any part of a day* per ton on vessel's total deadweight carrying capacity, including bunkers and
53  stores, on ................summer freeboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at
54  and after the same rate for any part of a month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) at *on dropping last outbound sea pilot/passing one (1) safe port in Charterers' option*
56  *Aden/Japan Range or in Charterers' option Skaw-Passero Range or in Charterers' option Montreal/Buenos Aires Range or in Charterers' option Vancouver/Antofagasta Range any time day or night Sundays and holidays included* unless otherwise mutually agreed. Charterers are to give Owners not less than *30/20/15/10/5 days approximate – all going well except unforeseen circumstances including but not limited to change of berthing turns at port of discharge –*
57  notice of vessels expected date of re-delivery, and *15 days minimum redelivery notice/port and definite* probable port *and definite redelivery notice 5/3/1 day(s) before redelivery.*

58      5.  Payment of said hire to be made as *per Clause #89* in New York in cash in United States Currency, *30 days* semi-monthly in advance, and for the last *30 days* half month or
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
63  following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they
64  to have the privilege of using vessel at once, such time used to count as hire.
65      Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67  of such advances.
68      6.  That the cargo or cargoes be laden and/or discharged in any *safe dock or at any safe wharf or safe place or safe anchorage* that Charterers or their Agents may
69  direct *no ship to ship transfer allowed,* provided the vessel can safely lie always afloat at any time of tide *at ice free ports and berths,* except at such places *in Buenaventura, Colombia, Brazil and Argentina, River Plate including Upriver, Uruguay* only where it is customary for similar size vessels to safely
70  lie aground. *See Clause #99. Vessel to be left in safe seaworthy trim between berths/ports to Master's satisfaction.*
71      7.  That the whole reach of the Vessel's Hold, Decks *(no deck cargo) (See Clause #51),* and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers
74  paying Owners ................per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are
75  incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.
76      8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency; and Charterers are to load, stow, *tally* and trim *secure and discharge (including extracting the cargo to a readily accessible point)* the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for
79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *Charterers not to issue any liner terms Bills of Lading, through Bills of Lading, and no trans-shipment allowed.*
80      9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82      10.  That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of $12.00 per day *for supercargo.* Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85  Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. *If Charterers decide to embark a supercargo he is to sign Owners' standard form of waiver before embarking the Vessel (wording can be made available if required).*
86      11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of said Logs, showing the course of the vessel and distance run and the con-
89  sumption of fuel.
90      12.  That the Captain shall use diligence in caring for the ventilation of the cargo.
91      13.  That the Charterers shall have the option of continuing this charter for a further period of................
92  ................
93  on giving written notice thereof to the Owners or their Agents................days previous to the expiration of the first-named term, or any declared option.
94      14.  That if required by Charterers, time not to commence before *See Clause #113*................and should vessel



95   not have *delivered given written notice of readiness* on or before *See Clause #113* _____ *but not later than 4 p.m.* Charterers or

96   their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness *as per Clause 113 Baltime Cancelling Clause.*

97     15. That in the event of the loss of time from deficiency *and/or default* of men *including strikes of officers and crew whether due to labor disputes or otherwise,* deficiency of or stores, fire, breakdown or damages to hull, machinery or equipment,

98   grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause

99   preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

100   defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101   thereof, and all extra *directly related* expenses shall be deducted from the hire. *Charterers giving full credit for any fuel or expenses saved in consequence of such reductions of speed.*

102     16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103   returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104   Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105     The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106   purpose of saving life and property.

107     17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London* New York *with minimum 13 months time bar,*

108   one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for

109   the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men. *This Charter Party shall be governed by the English Law. It is agreed that claims below U.S. $50,000.00 excluding interest and cost shall be conducted by a sole arbitrator and shall be conducted in accordance with LMAA Small Claims Procedure 1989 and any amendments thereto.*

10     18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-

111   age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112   deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113   might have priority over the title and interest of the owners in the vessel. *In no event shall Charterers procure, or permit to be procured for the Vessel, any supplies, necessaries or services without previously obtaining a statement signed by an authorized representative of the furnisher thereof, acknowledging that such supplies, necessaries or services are being furnished on the credit of Charterers and not on the credit of the Vessel or of her Owners, and that the furnished claims no maritime lien on the vessel therefore.*

114     19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115   Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of

116   York-Antwerp Rules *1994 or any amendments thereto* 1924, at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these

117   Rules, according to the laws and usages at the port of *London* New York. In such adjustment disbursements in foreign currencies shall be exchanged into

118   United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at

119   the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or

120   bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier

121   or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if

122   required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the

123   carrier, be payable in United States money and be remitted to the adjusters. When so remitted the deposit shall be held in a special account at the

124   place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in

125   United States money.

126     In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,

127   whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the

128   goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,

129   losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the

130   goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or

131   ships belonged to strangers. *Charter hire not to contribute to General Average.*

32   Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

33     20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grate and stoves to be agreed to as to quantity, and the

134   cost of replacing same, to be allowed by Owners. *Bunkers consumed during off-hire to be for Owners' account at Platt's nearest posted prices but maximum agreed Charter Party prices.*

135     21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a

136   convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from

137   time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.

138   *See Clause #58* _____

139   _____

140     22. Owners shall maintain the gear of the ship as fitted, providing gear (for all *cranes* derricks) capable of handling lifts *as per Clause #29* up to three tons, also

141   providing ropes, falls, slings and blocks *as on board.* If vessel is fitted with *cranes* derricks capable of handling heavier lifts, Owners are to provide necessary gear for

142   same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *sufficient lights as on board* lanterns and oil for

143   night work *free of expense to the Charterers,* and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The

144   Charterers to have the use of any gear *including grabs* on board the vessel.

145     23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;

146   *See Clause #29* steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,

147 deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
148 port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149 insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150 thereby.
151     24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153 etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154 of which are to be included in all bills of lading issued hereunder:
                                    U.S.A. Clause Paramount
155     This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
156 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
157 any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
158 be repugnant to said Act to any extent, such term shall be void to that extent, but no further.
159                                 Both-to-Blame Collision Clause
160     If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
161 Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
162 hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
163 or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
164 carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
165 owners as part of their claim against the carrying ship or carrier.
166     25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
167 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
168 port or to get out after having completed loading or discharging. *Vessel not to force ice, nor follow ice breakers and always understood that*
169 *Vessel not to trade in Ice.*
170     26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.
172     27.  A commission of 2 1/2 *1.25%* per cent is payable by the Vessel and Owners to *Overseas Shipping Corporation, Seoul and 1.25% to*
173 *Peraco Chartering (USA) Inc. plus 1.25% to International Chartering Services, Inc.* ————————————————————
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175     28.  An address commission of 2 1/2 per cent payable to *Charterers* ————————————— on the hire earned and paid under this Charter.

*Riders Clauses 29 through 120, both inclusive, as attached to form part of this Charter Party.*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the
insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having
been made by the licensee or end user as appropriate and not by the author.

KOREA LINE CORPORATION, SEOUL, KOREA                    For and on behalf of Owning Companies
                                                        as designated by ANEMI MARITIME SERVICES
                                                        as per authority dated June 11th, 2007
                                                        International Chartering Services, Inc.
                                                        as Brokers only




JAE - MIN PARK
EXECUTIVE VICE PRESIDENT
BUSINESS DIVISION                                       JAMES J. HAMMOND

# FIRST ORIGINAL

## Time Charter

GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

International Chartering Services, Inc.
525 Washington Blvd. - Suite 2407
Jersey City, New Jersey  07310
Phone: 201-604 -8585/Fax: 201-604-8586
IMAIL: ics@infreco.com

1  I.C.S. #010-07
**This Charter Party,** made and concluded in Jersey City, New Jersey ................................17th day of April, 2007 .............. 19....
2  Between Owning Companies as designated by *ANEMI MARITIME SERVICES* but understood Owners not to be domiciled in *Marshall Islands, Labuan, Liberia, Monaco, Andora or Liechtenstein*
3  Owners of the good ......................... Steamship/Motorship *M/V "TO BE NOMINATED" – See description as per Clause #29* of ..............
4  of................................tons gross register, and ...........................tons net register, having engines of ...........................indicated horse power
5  and with hull, machinery and equipment in a thoroughly efficient state, and classed
6  at ...............of about ...................cubic feet bale capacity, and about ...............tons of 2240 lbs.
7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,
8  allowing a minimum of fifty tons) on a draft of...............feet...............inches on...............Summer freeboard, inclusive of permanent bunkers,
9  which are of the capacity of about ...............tons of fuel, and capable of steaming, fully laden, under good weather
10  condition about ...............knots on a consumption of about ...............tons of best Welsh coal—best grade fuel oil—best grade Diesel oil,
11  now ......................................................................................................................................................................
12  ...............and *KOREA LINE CORPORATION* ...............Charterers of the City of *Seoul, Korea* ...............
13  **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14  about *a period of 3 Years plus or minus 3 months in Charterers' option. Option for fourth year to be declared by latest 33rd*
15  *month after delivery, option for fifth year to be declared by latest 45th month after delivery. Trading via safe port(s), safe berth(s), safe anchorage(s), always afloat (except for Clauses #6 and #99) and always within IWL (except for Clause #76) with lawful/harmless cargoes* ...............within below mentioned trading limits.
16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17  the fulfillment of this Charter Party. *The minimum duration of 990 days is guaranteed and payable by Charterers.*
18  Vessel to be placed at the disposal of the Charterers, at *upon sailing from Builder's Yard in China any time day or night Sundays and*
19  *holidays included.*
20  in each dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as
21  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on *arrival at first load port* her delivery to the
22  ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast, *cranes* winches and
23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the *cranes* winches at one and the same
24  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25  dise, including petroleum or its products, in proper containers excluding *See Clause #51* ...............within below mentioned trading
26  (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
27  all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North
28  America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or
29  Mexico, and/or South America, ...............and/or Europe
30  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between
31  October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,
32  *See Clause #52 – Trading Exclusions*
33  ......................................................................................................................................................................
34  ......................................................................................................................................................................
35  as the Charterers or their Agents shall direct, on the following conditions:
36  1.   That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the
37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including *drinking water, lubricating oil and garbage due, if not compulsory,* boiler water and maintain her clean and keep
38  the vessel in a thoroughly efficient state in hull, machinery and equipment *with inspection necessary to comply with current requirements at ports of call and canals for and during the service. It is understood that if any extra documents other than usual trading certificates to meet special and specific requirements are required, in a particular port or private terminal, same to be for Charterers' account including but not limited to additional mooring lines which to be arranged for and paid by Charterers. Vessel is fitted with 12 mooring lines of 220 Meters each.*
39  2.   That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and customary Pilotages including Japanese inland sea including Bungo Channel, Dardanelles Strait, Bosporus Strait, Skaw/Spodsbjerg (Great Belt) and Strait of Magellan, Boatage on Charterers' business,* Agencies for Charterers' business, clearance and cargo purposes *only,* Commissions,
40  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried *and/or cargoes intended to be carried,* or ports visited while vessel is employed under this

43  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44  of six months or more.

45  Charterers are to provide necessary dunnage.*Shippers to submit to Master Phyto-Sanitary Certificate of Dunnage, issued by local
    authority, prior departure failing which Charterers shall remain responsible for any consequences in U.S.A. or other
    authority's fines/delays,* and shifting boards *and material,* also any extra fittings requisite for a special trade or unusual cargo, but
46  Owners or allow them the use of any dunnage, *lashing materials as on board* and shifting boards already aboard vessel. Charterers to have the privilege of
    using shifting boards
47  for dunnage, they making good any damage thereto.
48  3.    That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
49  board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than _____ tons and not more than
50  _____ tons and not to be re-delivered with not less than _____ tons and not more than _____ tons. *See Clause #61.*
51  4.    That the Charterers shall pay for the use and hire of the said Vessel at the rate of *U.S. $18,500.00 daily including overtime payable 30*____
52  *days in advance (See Clause #122)* _____ United States Currency *or pro rata for any part of a day* per ton on vessel's total deadweight carrying
    capacity, including bunkers and
53  stores, on _____ commencing on and from the day of her delivery, as aforesaid, and at
54  and after the same rate for any part of a month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) at *on dropping last outbound sea pilot/passing one (1) safe port in Charterers' option*
56  *Aden/Japan Range or in Charterers' option Skaw-Passero Range or in Charterers' option Montreal/Buenos Aires Range or in
    Charterers' option Vancouver/Antofagasta Range any time day or night Sundays and holidays included* unless otherwise mutually
    agreed. Charterers are to give Owners not less than *30/20/15/10/5* days *approximate - all going well except unforeseen circumstances
    including but not limited to change of berthing turns at port of discharge*
57  notice of vessels expected date of re-delivery, and *15 days minimum redelivery notice/port and definite* probable port *and definite redelivery
    notice 5/3/1 day(s) before redelivery.*
58  5.    Payment of said hire to be made as per Clause #89 in New York in cash in United States Currency, *30 days* semi-monthly in advance, and for
    the last *30 days* half month or
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
63  following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they
65  to have the privilege of using vessel at once, such time used to count as hire.
65  Cash for vessels ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67  of such advances.
68  6.    That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place or *safe* anchorage that Charterers or
    their Agents may
69  direct *no ship to ship transfer allowed,* provided the vessel can safely lie always afloat at any time of tide *at ice free ports and berths,* except at
    such places in *Buenaventura, Colombia, Brazil and Argentina, River Plate including Upriver, Uruguay only* where it is customary for
    similar size vessels to safely
70  lie aground. *See Clause #99.  Vessel to be left in safe seaworthy trim between berths/ports to Master's satisfaction.*
71  7.    That the whole reach of the Vessel's Hold, Decks *(no deck cargo) (See Clause #51),* and usual places of loading (not more than she can
    reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers
74  paying Owners _____ per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expense are
75  incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.
76  8.    That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency; and Charterers are to load, stow, *tally* and trim *secure and discharge (including extracting the cargo to a readily accessible point)*
    the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for
79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *Charterers not to issue any liner terms Bills of Lading, through Bills of
    Lading, and no trans-shipment allowed.*
80  9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82  10.    That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of *$12.00* per day *for supercargo.* Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85  Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. *If Charterers decide to embark a supercargo
    he is to sign Owners' standard form of waiver before embarking the Vessel (wording can be made available if required).*
86  11.    That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
89  sumption of fuel.
90  12.    That the Captain shall use diligence in caring for the ventilation of the cargo.
91  13.    That the Charterers shall have the option of continuing this charter for a further period of _____
92  _____
93  on giving written notice thereof to the Owners or their Agents _____ days previous to the expiration of the first-named term, or any declared option.
94  14.    That if required by Charterers, time not to commence before *See Clause #113* _____ and should vessel

95 not have *delivered* given written notice of readiness on or before *See Clause #113* _____ but not later than 4 p.m. Charterers or

96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness *as per Clause 113 Baltime Cancelling Clause.*

97 15. That in the event of the loss of time from deficiency *and/or default* of men *including strikes of officers and crew whether due to labor disputes or otherwise, deficiency* of or stores, fire, breakdown or damages to hull, machinery or equipment,

98 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause

99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101 thereof, and all extra *directly related* expenses shall be deducted from the hire. *Charterers giving full credit for any fuel or expenses saved in consequence of such reductions of speed.*

102 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106 purpose of saving life and property.

107 17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London* New York *with minimum 13 months time bar,*

108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for

109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men. *This Charter Party shall be governed by the English Law. It is agreed that claims below U.S. $50,000.00 excluding interest and cost shall be conducted by a sole arbitrator and shall be conducted in accordance with LMAA Small Claims Procedure 1989 and any amendments thereto.*

110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-

111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, any overpaid hire or excess

112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113 might have priority over the title and interest of the owners in the vessel. *In no event shall Charterers procure, or permit to be procured for the Vessel, any supplies, necessaries or services without previously obtaining an authorized representative of the furnisher thereof, acknowledging that such supplies, necessaries or services are being furnished on the credit of Charterers and not on the credit of the Vessel or of her Owners, and that the furnished claims no maritime lien on the vessel therefore.*

114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115 Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of

116 York-Antwerp Rules 1994 *or any amendments thereto* 1924, at each port or place in the United States as may be selected by the carrier, and as to matters not provided for by these

117 Rules, according to the laws and usages at the port of *London* New York. In such adjustment disbursements in foreign currencies shall be exchanged into

118 United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at

119 the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or

120 bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier

121 or his agents may deem sufficient to additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if

122 required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the

123 carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the

124 place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in

125 United States money.

126 In the event of accident, danger, damage or disaster, before or after commencement of the voyage, resulting from any cause whatsoever,

127 whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the

128 goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,

129 losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the

130 goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or

131 ships belonged to strangers. *Charter hire not to contribute to General Average.*

132 Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133 20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the

134 cost of replacing same, to be allowed by Owners. *Bunkers consumed during off-hire to be for Owners' account at Platt's nearest posted prices but maximum agreed Charter Party prices.*

135 21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a

136 convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from

137 time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.

138 *See Clause #58* _____

139

140 22. Owners shall maintain the gear of the ship as fitted, providing gear (for all *cranes* derricks) capable of handling lifts *as per Clause #29* up to three tons, also

141 providing ropes, falls, slings and blocks *as on board.* If vessel is fitted with *cranes* derricks capable of handling heavier lifts, Owners are to provide necessary gear for

142 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *sufficient lights as on board* lanterns and oil for

143 night work *free of expense to the Charterers,* and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The

144 Charterers to have the use of any gear *including grabs* on board the vessel.

145 23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;

146 *See Clause #29* steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,

147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150 ~~thereby.~~
151   ~~24.   It is also mutually agreed that Charter is subject to all the terms and provisions of and all the exceptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder:~~
155                                        ~~U.S.A. Clause Paramount~~
156   ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
160                                       ~~Both-to-Blame Collision Clause~~
161   ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~
167   25.   The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging. *Vessel not to force ice, nor follow ice breakers and always understood that
Vessel not to trade in ice.*
170   26.   Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.
172   27.   A commission of ~~2 1/2~~ *1.25%* per cent is payable by the Vessel and Owners to *Overseas Shipping Corporation, Seoul and 1.25% to
173 Peraco Chartering (USA) LLC plus 1.25% to International Chartering Services, Inc.* ................................................................
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175   ~~28.   An address commission of 2 1/2 per cent payable to ........................................on the hire earned and paid under this Charter.~~

*Riders Clauses 29 through 121, both inclusive, as attached to form part of this Charter Party.*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the
insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having
been made by the licensee or end user as appropriate and not by the author.

KOREA LINE CORPORATION
SEOUL, KOREA

For and on behalf of Owning Companies
as designated by Anemi Maritime Services
as per authority dated June 11th, 2009
International Chartering Services, Inc.
as Brokers only

_____
JAE - MIN PARK
EXECUTIVE VICE PRESIDENT
BUSINESS DIVISION

_____
JAMES J. HAMMOND



International Chartering Services, Inc.
525 Washington Blvd. - Suite 2407
Jersey City, New Jersey  07310
Phone: 201-604-8585/Fax: 201-604-8586
IMAIL: ics@infreco.com

# FIRST ORIGINAL

## Time Charter

### GOVERNMENT FORM

*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946



EAGLE OPERATIONS
DATE:
BY:

1    I.C.S. #013-07

**This Charter Party**, made and concluded ~~in Jersey City~~, New Jersey..................................23rd day of *April, 2007*.................19....
2    Between *Owning Companies* as designated by *ANEMI MARITIME SERVICES* but understood Owners not to be domiciled in
     *Marshall Islands, Labuan, Liberia, Monaco, Andora or Liechtenstein*
3    Owners of the good ......................... Steamship/Motorship *M/V "TO BE NOMINATED" - See description as per Clause #29* of
4    of .....................................................tons gross register, and....................tons net register, having engines of.......................indicated horse power
5    and with hull, machinery and equipment in a thoroughly efficient state, and classed
6    at...............................of about........................cubic feet bale capacity, and about ........................tons of 2240 lbs.
7    deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,
8    allowing a minimum of fifty tons) on a draft of................feet................inches on............Summer freeboard, inclusive of permanent bunkers,
9    which are of the capacity of about.....................................tons of fuel, and capable of steaming, fully laden, under good weather
10   conditions about ...............knots on a consumption of about......................tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,
11   now
12   .............................. and *KOREA LINE CORPORATION* ........................ Charterers of the City of *Seoul, Korea*.
13   **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14   about *a period of 7 Years plus or minus 6 months in Charterers' option. Trading via safe port(s), safe berth(s), safe*
15   *anchorage(s), always afloat (except for Clauses #6 and #99) and always within IWL (except for Clause #76) with*
16   *lawful/harmless cargoes* ............................................................................... within below mentioned trading limits.
     Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17   the fulfillment of this Charter Party. *The minimum duration of 2145 days is guaranteed and payable by Charterers.*
18   Vessel to be placed at the disposal of the Charterers, at *upon sailing from Builder's Yard in China any time day or night Sundays and*
19   *holidays included.*
20   ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~
21   ~~the Charterers may direct. If such dock, wharf or place be not available the count as provided for in clause No. 5.~~ Vessel on *arrival at first load port* has
     delivery to be
22   ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast,*cranes* winches and
23   donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the *cranes* winches at one and the same
24   time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25   dise, including petroleum or its products, in-proper-containers excluding *See Clause #51*
26   ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~
27   ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~
28   ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
29   ~~Mexico, and/or South America.~~                                                                                        ~~and/or Europe~~
30   ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~
31   ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~
32   *See Clause #52 - Trading Exclusions*
33
34
35   as the Charterers or their Agents shall direct, on the following conditions:
36      1.    That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for
37   insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including *drinking water, lubricating oil and garbage*
     *due, if not compulsory,* boiler water and maintain her class and keep
38   the vessel in a thoroughly efficient state in hull, machinery and equipment*with inspection necessary to comply with current requirements at*
     *ports of call and canals for* and during the service. *It is understood that if any extra documents other than usual trading certificates*
     *to meet special and specific requirements are required, in a particular port or private terminal, same to be for Charterers'*
     *account including but not limited to additional mooring lines which to be arranged for and paid by Charterers. Vessel is fitted*
     *with 12 mooring lines of 220 Meters each.*
39      2.    That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and customary*
     Pilotages *including Japanese Inland sea including Bungo Channel, Dardanelles Strait, Bosporus Strait, Skaw/Spodsbjerg (Great*
     *Belt) and Strait of Magellan, Boatage on Charterers' business,* Agencies *for Charterers' business,* clearance and cargo purposes
     *only,* Commissions,
40   Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41   a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42   illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried *and/or cargoes intended to be carried,* or ports visited
     while vessel is employed under this
43   charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous  period



44 of six months or more.

45     Charterers are to provide necessary dunnage *Skippers to submit to Master Phyto-Sanitary Certificate of Dunnage, issued by local authority, prior departure failing which Charterers shall remain responsible for any consequences in U.S.A. or other authority's fines/delays,* and shifting boards *and material,* also any extra fittings requisite for a special trade or unusual cargo, but

46 Owners to allow them the use of any dunnage, *lashing materials as on board* and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47 for dunnage, they making good any damage thereto.

48     3.  That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on

49 board the vessel ~~at the current prices in the respective ports, the vessel to be delivered with not less than~~ ........................................ ~~tons and not more than~~

50 ........................ ~~tons and to be re-delivered with not less than~~ ........................ ~~tons and not more than~~ ........................ ~~tons.~~ *See Clause #61.*

51     4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of *U.S. $18,400.00 daily including overtime payable 30*

52 *days in advance* ...... United States Currency *or pro rata for any part of a day* per ~~ton on vessel's total deadweight carrying capacity, including bunkers~~ and

53 ~~stores, on~~ ........................................ ~~summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at

54 and after the same rate for any part of a month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55 wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot/passing one (1) safe port in Charterers' option*

56 *Aden/Japan Range or in Charterers' option Skaw-Passero Range or in Charterers' option Montreal/Buenos Aires Range or in Charterers' option Vancouver/Antofagasta Range any time day or night Sundays and holidays included* unless otherwise mutually agreed. Charterers are to give Owners not less than *30/20/15/10/5* days *approximate - all going well except unforeseen circumstances including but not limited to change of berthing times at port of discharge -*

57 notice of vessels expected date of re-delivery, and *15 days minimum redelivery notice/port and definite* ~~probable~~ port *and definite redelivery notice 5/3/1 day(s) before redelivery.*

58     5.  Payment of said hire to be made *as per Clause #89* ~~in New York~~ in cash in United States Currency, *30 days* ~~semi-monthly~~ in advance, and for the last *30 days* ~~half month or~~

59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61 hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~

63 ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64 ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65     Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject

66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67 of such advances.

68     6.  That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place *or safe anchorage* that Charterers or

69 their Agents may direct *no ship to ship transfer allowed,* provided the vessel can safely lie always afloat at any time of tide *at ice free ports and berths* except at such places *in Buenaventura, Colombia, Brazil and Argentina, River Plate including Upriver, Uruguay only* where it is customary for similar size vessels to safely

70 lie aground. *See Clause #99.  Vessel to be left in safe seaworthy trim between berths/ports to Master's satisfaction.*

71     7.  That the whole reach of the Vessel's Hold, Decks *(no deck cargo) (See Clause #51),* and usual places of loading (not more than she can reasonably stow and carry), also

72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73 tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

74 ~~paying Owners~~ ........................ ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expense are~~

75 ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~

76     8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78 agency; and Charterers are to load, stow, *tally* and trim *secure and discharge (including extracting the cargo to a readily accessible point)* the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for

79 cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *Charterers not to issue any liner terms Bills of Lading, through Bills of Lading, and no trans-shipment allowed.*

80     9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82     10.  That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84 rate of $12.00 per day *for supercargo.* ~~Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally~~

85 ~~Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling.~~ *If Charterers decide to embark a supercargo he is to sign Owners' standard form of waiver before embarking the Vessel (wording can be made available if required).*

86     11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88 terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-

89 sumption of fuel.

90     12. : That the Captain shall use diligence in caring for the ventilation of the cargo.

91     13.  ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ........................................

92 ........................................

93 ~~on giving written notice thereof to the Owners or their Agents~~ ........................ ~~days previous to the expiration of the first-named term, or any declared option.~~

94     14.  That if required by Charterers, time not to commence before *See Clause #113* ........................................ and should vessel

95 not have *delivered* ~~given written notice of readiness~~ on or before *See Clause #113* ........................................ but not later than 4 p.m. Charterers or

96   their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness *as per Clause 113 Baltime Cancelling Clause.*

     15. That in the event of the loss of time from deficiency *and/or default* of men *including strikes of officers and crew whether due to*
97   *labor disputes or otherwise, deficiency of* or stores, fire, breakdown or damages to hull, machinery or equipment,
98   grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99   preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101  thereof, and all extra *directly related* expenses shall be deducted from the hire. *Charterers giving full credit for any fuel or expenses saved in consequence of such reductions of speed.*

102  16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106  purpose of saving life and property.

107  17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London* ~~New York~~ *with minimum 13 months time bar,*
108  one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109  the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men. *This Charter Party shall be governed by the English Law. It is agreed that claims below U.S. $50,000.00 excluding interest and cost shall be conducted by a sole arbitrator and shall be conducted in accordance with LMAA Small Claims Procedure 1989 and any amendments thereto.*

110  18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or incumbrance incurred by them or their agents, which
113  might have priority over the title and interest of the owners in the vessel. *In no event shall Charterers procure, or permit to be procured for the Vessel, any supplies, necessaries or services without previously obtaining a statement signed by an authorized representative of the furnisher thereof, acknowledging that such supplies, necessaries or services are being furnished on the credit of Charterers and not on the credit of the Vessel or of her Owners, and that the furnished claims no maritime lien on the vessel therefore.*

114  19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115  Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
116  York-Antwerp Rules *1994 or any amendments thereto* ~~1924, at such port or place in the United States as may be selected by the carrier,~~ and as to matters not provided for by these
117  ~~Rules, according to the laws and usages at the port of~~ *London* ~~New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118  ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119  ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120  ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121  ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122  ~~required, be made by the goods, shippers, consignees or owner of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123  ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124  ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125  ~~United States money.~~
126  ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127  ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128  ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129  ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130  ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131  ~~ships belonged to strangers.~~ *Charter hire not to contribute to General Average.*
132  Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133  20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
134  cost of replacing same, to be allowed by Owners. *Bunkers consumed during off-hire to be for Owners' account at Platt's nearest posted prices but maximum agreed Charter Party prices.*

135  21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136  ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137  ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138  *See Clause #58*

139

140  22. Owners shall maintain the gear of the ship as fitted, providing gear (for all *cranes* ~~derricks~~) capable of handling lifts *as per Clause #29* ~~up to three tons,~~ also
141  providing ropes, falls, slings and blocks *as on board.* If vessel is fitted with *cranes* ~~derricks~~ capable of handling heavier lifts, Owners are to provide necessary gear for
142  same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *sufficient lights as on board* ~~lanterns and oil for~~
143  night work *free of expense to the Charterers,* ~~and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at~~ ~~Charterers' expense.~~ The
144  Charterers to have the use of any gear *including grabs* on board the vessel.

145  23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;
146  *See Clause #29* ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers,~~ ~~winchmen,~~
147  ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~

148  port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149  insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150  thereby.
151  24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;
153  etc.," in respect of all cargo shipped under this charter to or from the United States of America It is further subject to the following clauses, both
154  of which are to be included in all bills of lading issued hereunder:
155                                                U.S.A. Clause Paramount
156          This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157  16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158  any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159  be repugnant to said Act to any extent, such term shall be void to that extent, but no further.
160                                              Both to Blame Collision Clause
161          If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162  Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163  hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164  or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165  carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166  owners as part of their claim against the carrying ship or carrier.
167  25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169  port or to get out after having completed loading or discharging.  *Vessel not to force ice, nor follow ice breakers and always understood that*
      *Vessel not to trade in ice.*
170  26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171  navigation of the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.
172  27.  A commission of 2-1/2 per cent is payable by the Vessel and Owners to *Overseas Shipping Corporation, Seoul and 1.25% to*
173  *Peraco Chartering (USA) LLC plus 1.25% to International Chartering Services, Inc.* _____
174  on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175  28.  An address commission of 2-1/2 per cent payable to _____on the hire earned and paid under this Charter.

*Riders Clauses 29 through 121, both inclusive, as attached to form part of this Charter Party.*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the
insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having
been made by the licensee or end user as appropriate and not by the author.

KOREA LINE CORPORATION
SEOUL, KOREA

For and on behalf of Owning Companies
as designated by Anemi Maritime Services
as per authority dated June 11th, 2007
International Chartering Services, Inc.
as brokers only

JAE - MIN PARK
EXECUTIVE VICE PRESIDENT
BUSINESS DIVISION

JAMES J. HAMMOND