UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: OCT 0 8 2015

International Chartering Services, Inc., *et al.*,

Plaintiffs,

—v—

Eagle Bulk Shipping Inc., *et al.*,

Defendants.

12-cv-3463 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

This is a maritime action for breach of contract and unjust enrichment based on Defendants' alleged failure to pay brokerage commissions in connection with thirteen contracts, called charter parties. Before the Court on remand from the Second Circuit is Defendants' renewed request to compel arbitration on Plaintiffs' claims. For the following reasons, Defendants' motion is GRANTED in part. The Court requires additional briefing from the parties as to whether Plaintiffs have any claims independent of the charter parties.

I.      **Background**

The Court assumes familiarity with its previous order, Dkt. No. 33, and the Second Circuit's summary order, Dkt. No. 65. This opinion contains only the facts relevant to the questions currently before the Court.

A.  **Facts**

Plaintiffs International Chartering Services ("ICS") and Peraco Chartering (USA) LLC ("Peraco") are shipbrokers, ship managers, and transportation consultants. Compl. ¶¶ 13–15. Thirteen defendants in this case are limited liability companies that each own a single dry bulk

1

shipping vessel ("ship-owning Defendants"). *Id.* ¶¶ 19–20. The ship-owning Defendants are all wholly owned subsidiaries of Defendant Anemi Maritime Services, S.A. ("Anemi"). *Id.* ¶ 2. At the time the charter parties (that is, contracts) at issue in this case were signed, Anemi was a wholly owned subsidiary of non-party Kyrini Shipping, Inc. *Id.* A few months after the contracts were complete, Anemi and its subsidiaries were purchased by Eagle Bulk Shipping Inc. ("Eagle"). *Id.* ¶ 4. Eagle and its wholly owned subsidiaries comprise all the defendants in this case.

ICS's brokerage relationship with Anemi dates back to 2005, and Peraco's brokerage relationship with Anemi, secured through ICS, began in 2006. *Id.* ¶¶ 25–26. Plaintiffs introduced Anemi to non-party Korea Line Corporation ("Korea Line"), who chartered one of Anemi's vessels. Dushas Aff. ¶ 16; Hammond Aff. ¶¶ 15–17; Stavnes Aff. ¶ 4. In late 2006, Plaintiffs arranged further discussions between Anemi and Korea Line—discussions that resulted in agreements to charter the thirteen vessels at issue in this case. Dushas Aff. ¶ 23; Hammond Aff. ¶ 19.

Korea Line entered into the thirteen charter parties underlying the dispute in 2007 by signing four master charter parties (each chartering multiple ships). Compl. ¶ 4; Weller Decl. Exs. A–D. The charter parties were formally between Charterers and Owners. "Charterers" was defined as Korea Line, and "Owners" was defined as ship owners to be designated by Anemi. Compl. ¶ 20. The owners that Anemi selected are the ship-owning Defendants. *Id.* Plaintiffs were not signatories to the charter parties. Weller Decl. Exs. A–D. However, they served as deal brokers and participated in negotiations. The charter parties set forth commission rates payable to Plaintiffs, but Plaintiffs allege that they separately negotiated commission rates with Anemi according to the parties' previous custom, and that the final commission rates were

memorialized in an email dated May 4, 2007.  Compl. ¶ 30; Weller Decl. Exs. A–D; Hammond Aff. ¶¶ 20–22; Dushas Aff. ¶ 26; Stavnes Aff. ¶ 8.  Each of the four master charter parties contains an identical arbitration provision, which states that "should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at London." Weller Decl. Exs. A–D.  They also each contain the same choice-of-law provision stating that "[t]his Charter Party shall be governed by the English Law."  *Id.*  Eagle purchased Anemi and its subsidiaries (including all ship-owning Defendants) in July 2007, shortly after the charter parties were signed.  Compl. ¶¶ 35–36.

Korea Line fell into financial difficulties as a result of a market downturn, and in 2011 it entered rehabilitation proceedings (a form of insolvency proceeding) in the Seoul Central District Court.  Compl. ¶ 39; Weller Decl. ¶ 17.  To preserve the charter parties, Korea Line, Anemi, and the ship-owning Defendants (*i.e.*, all parties other than Eagle), negotiated modifications to their agreements.  The modifications were implemented as part of a Master Agreement and addenda executed by the ship-owning Defendants and the receivers for Korea Line on March 3, 2011. Weller Decl. ¶ 20, Exs. H, I; Compl. ¶¶ 41, 44.  The net result of these modifications was to create a "suspension period" of approximately one year during which Defendants would seek other employment for their vessels, with Korea Line guaranteeing a minimum income of $17,000 per vessel per day.  Weller Decl. ¶ 19; Stavnes Aff. ¶ 19.  At the end of the suspension period, Defendants would resume their work for Korea Line at a reduced rate of hire, but subject to a profit-sharing agreement.  Weller Decl. ¶ 19.

## B.  This Litigation

In December 2011, Eagle informed Plaintiffs that it would not pay their commissions during the suspension period.  Compl. ¶ 68.  Plaintiffs responded by bringing this suit for breach

of contract, breach of maritime contract, willful frustration of contract, unjust enrichment, and accounting in the Supreme Court of New York for New York County.

Defendants removed to this Court and filed a motion to compel arbitration under the charter parties. *See* Dkt. No. 2. Plaintiffs raised two lines of argument in response. *See* Dkt. No. 12. First, they argued that their claims did not arise under the charter parties at all, but rather stemmed from a separate contract memorialized in the May 4, 2007, emails. Second, they argued that even if their claims *did* arise under the charter parties, they were not bound by the arbitration clauses. The Court denied Defendants' motion to compel arbitration on March 6, 2013. The parties did not raise the choice of law issue, and this Court determined that under federal common law, Plaintiffs were neither "owners" nor "charterers," and thus were not covered by the charter parties' arbitration clauses. *See* Dkt. No. 33. The Court did not reach the question of the independence of Plaintiffs' claims.

Despite noting that the choice-of-law issue was likely waived, the Second Circuit reversed this Court's denial on interlocutory appeal and remanded for a choice-of-law analysis. *See* Dkt. No. 65, *Int'l Chartering Servs., Inc. v. Eagle Bulk Shipping Inc.*, 557 Fed. App'x 81, 83 & n.3 (2d Cir. 2014). Specifically, the Court of Appeals held that if the charter parties' arbitration clauses were interpreted under English law, Plaintiffs would be included in the phrase "Owners and the Charterers" as assignees from the original parties. *Id.* at 83. The charter parties would therefore require arbitration of Plaintiffs' claims. But, as this Court held and the Second Circuit did not reverse, under federal law Plaintiffs are not included in the phrase "Owners and the Charterers," and thus their claims under the charter parties would not be arbitrable. *See id.* Having concluded that the choice-of-law analysis would be outcome determinative, the Court of Appeals remanded the case to this Court with instructions to determine (1) whether federal or

English maritime law should apply under federal maritime choice-of-law rules to the question of whether Plaintiffs' claims under the charter parties must be arbitrated, and if so, (2) whether Plaintiffs have claims that are independent of the charter parties and need not be arbitrated. *See id.* After the parties had fully briefed these questions on remand, Eagle filed a notice of suggestion of bankruptcy, and the case was stayed. That stay has now been lifted, and the parties agree that the pending questions should be decided. *See* Dkt. No. 80.

## II. Whether English or Federal Law Determines if Plaintiffs' Claims Under the Charter Parties Must Be Arbitrated

Adopting the Second Circuit's ordering of the issues, the Court first turns to whether English law or federal law governs the question of whether Plaintiffs' claims under the charter parties must be arbitrated. As noted above, the Second Circuit determined that English law would give an interpretation to the phrase "Owners and the Charterers" in the charter parties that included Plaintiffs as assignees, thus folding them into the arbitration clauses. *Int'l Chartering*, 557 Fed. App'x at 83. This Court previously determined that under federal law, the charter parties' arbitration clauses—which by their terms apply only to "Owners and the Charterers"— did not apply to Plaintiffs. The Second Circuit did not reverse that conclusion. *Id.* ("Were substantive federal maritime law to apply, [the District Court's holding] might be correct."). Thus, as the Second Circuit held, "[s]ince English law and federal law produce different results, the choice of law analysis is essential." *Id.*

As a preliminary matter, Plaintiffs argue that Defendants have consented to the application of federal maritime law for the interpretation of the charter parties, and therefore a choice-of-law analysis is unnecessary. This argument is foreclosed by the Second Circuit's order, which found the choice-of-law question sufficiently preserved, *see id.* at 83 n.3. It would

be anomalous to find that Defendants preserved the question of whether English law should

apply, and nevertheless conceded that federal maritime law applies.  While the Second Circuit

acknowledged that the preservation issue was a "close question," its conclusion that the issue

should be considered preserved was unequivocal.  Plaintiffs' evidence of statements to the

contrary cannot alter that conclusion at this point.  The Court therefore turns to the choice-of-law

analysis.

      In assessing this issue, the Court is guided by the background principle that "when parties

properly invoke admiralty jurisdiction, courts apply federal maritime choice-of-law rules." *Blue*

*Whale Corp. v. Grand China Shipping Dev. Co.*, 722 F.3d 488, 498 (2d Cir. 2013).  With this

rule in mind, the Court's analysis proceeds in three steps: First, the Court considers whether the

choice-of-law clauses in the charter parties can bind Plaintiffs, even though they are not

signatories to the contract.  Second, the Court discusses the legal standard employed to determine

if a choice-of-law clause will control how the underlying contract is interpreted.  Third, the Court

applies the standard to the facts of this case.

### A. Whether the Choice-of-law Clauses Bind Plaintiffs Despite Their Status as Non-signatories to the Charter Parties

      The four master charter parties in this case each contain a choice-of-law clause that states

"[t]his Charter Party shall be governed by the English Law."  Weller Decl. Exs. A–D.  In

litigation over a contract containing a choice-of-law clause, the first step in a choice-of-law

analysis is to consider the import of that clause.  *See, e.g.*, *Roby v. Corp. of Lloyd's*, 996 F.2d

1353, 1362–63 (2d Cir. 1993).  Plaintiffs argue that the choice-of-law clauses cannot be used in

determining arbitrability because Plaintiffs are not signatories to the charter parties.  This claim

runs parallel to their American-law argument that they should not be bound to arbitrate under a contract they did not sign.  The Court disagrees on both counts.

Plaintiffs invoke the framework set out in *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 355 (S.D.N.Y. 2005) (Sand, J.), arguing that a choice-of-law clause governs when a non-signatory attempts to force a signatory to arbitrate, but not when the positions are reversed, as they are here.  The district court in *Republic of Ecuador* devised this rule to reconcile two seemingly conflicting authorities: *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 51 (2d Cir. 2004), which applied choice-of-law clauses to an arbitrability dispute, and *Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 661 (2d Cir. 2005), which applied federal common law in a similar situation.  The *Republic of Ecuador* framework has been criticized by other district courts for promoting forum shopping, and for having no basis in the reasoning of *Motorola. FR 8 Singapore Pte. Ltd. v. Albacore Mar. Inc.*, 754 F. Supp. 2d 628, 635–36 (S.D.N.Y. 2010) (Holwell, J.).

The Court declines Plaintiffs' invitation to adopt the *Republic of Ecuador* framework. Any apparent tension between *Motorola* and *Sarhank* dissipates when the two cases are properly understood.  In *Sarhank*, the Sarhank Group engaged in arbitration in Egypt with a Cyprus-based Oracle subsidiary.  *Sarhank*, 404 F.3d at 658.  The dispute stemmed from an agreement between the two entities that selected Egyptian law.  *Id.*  The arbitrators determined that Egyptian law bound the non-signatory Oracle to arbitrate as well, and entered a large award against the American corporation.  *Id.* at 658–59.  The Sarhank Group sought enforcement of the arbitral award in New York.  *Id.* at 659.  The Second Circuit refused to enforce the award, holding that as an American non-signatory Oracle could not be bound to arbitrate in the absence of "an articulable theory based on American contract law or American agency law."  *Id.* at 662.

7

Arbitration requires consent. *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004). Under American law, there are only five theories under which a non-signatory can be forced into arbitration: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003). *Sarhank* rejected the contract's choice of Egyptian law of arbitrability because its broad-brush willingness to bind a non-signatory to arbitration was "contrary to American public policy." *Sarhank*, 404 F.3d at 661. As the court explained:

> To hold otherwise would defeat the ordinary and customary expectations of experienced business persons. The principal reason corporations form wholly owned foreign subsidiaries is to insulate themselves from liability for the torts and contracts of the subsidiary and from the jurisdiction of foreign courts. The practice of dealing through a subsidiary is entirely appropriate and essential to our nation's conduct of foreign trade.

*Id.* at 662. It is a maxim of the law of conflicts that American courts will not enforce parties' choice of law or forum if it "contravene[s] a strong public policy of the forum state." *Roby*, 996 F.2d at 1363; *see also, e.g.*, Restatement (Second) of Conflict of Laws § 187 (Am. Law Inst. 1971). *Sarhank* does not represent a novel blanket rule about signatories and non-signatories, but merely an articulation of this longstanding principle.

*Motorola*, by contrast, presented no such challenge to American arbitral policy. In that case, Motorola had contracts with Turkish telecom companies that contained arbitration clauses. *Motorola*, 388 F.3d at 43. Motorola sued the non-signatory individuals who owned the companies. *Id.* at 44. The individuals attempted to force Motorola into arbitration under the telecom contracts. *Id.* The Second Circuit applied the Swiss choice-of-law clauses in the contracts to interpret the arbitration clauses, against the defendants' wishes. *Id.* at 51. The court explained that there were no concerns about binding the non-signatory defendants, because if they "wish to invoke the arbitration clauses in the agreements at issue, they must also accept the

Swiss choice-of-law clauses that govern those agreements." *Id.* In other words, Defendants were bound to the choice-of-law clauses by estoppel, a theory rooted in traditional contract principles and acceptable to American public policy.

Although Plaintiffs are not signatories to the charter parties, and they are not seeking to invoke the arbitration provisions in the contracts as were the defendants in *Motorola*, applying English law and requiring Plaintiffs to arbitrate does not go against American public policy. Like the *Motorola* defendants, Plaintiffs are estopped from denying the choice-of-law provisions *insofar as* their claims arise under the contract. This is because "[a] party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause," even if it is not a signatory to the agreement. *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999). Importantly, the same principle applies to bind non-signatories to choice-of-law clauses. *Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. Henderson*, Nos. 10-cv-8033, 11-cv-3869, 2013 WL 1245451, at *4 (S.D.N.Y. Mar. 26, 2013). Under this doctrine of direct benefit estoppel, "a non-signatory who claims entitlement to payment based on the contractual obligations of a signatory is seeking a benefit under the contract." *Id.*; *see World Omni Fin. Corp. v. Ace Capital Re Inc.*, 64 Fed. App'x 809, 812–13 (2d Cir. 2003) (insurance claimant received direct benefit from reinsurance policy to which it was not a signatory).

*Robinson Brog Leinwand Greene Genovese & Gluck, P.C. v. John M. O'Quinn & Assocs., L.L.P.*, 523 Fed. App'x 761 (2d Cir. 2013), is instructive. Robinson Brog, one of several law firms representing a group of plaintiffs, sued its co-counsel seeking its share of attorneys' fees. The Second Circuit held that the firm was bound by direct benefit estoppel to an arbitration clause in the client representation agreement, to which it was not a signatory.

9

"Without a client to represent," the court explained, "there could be no net settlement or recovery and thus no basis for distributing attorneys' fees." *Id.* at 763. Accordingly, Robinson Brog "may not seek to benefit from the portion of the Client Agreement that creates the pool of funds for payment of attorneys' fees without also subjecting itself to the arbitration clause contained in that same agreement." *Id.*

A similar result obtained in the choice-of-law context in *Henderson*. In that case, an injured sailor sought to enforce a judgment rendered against a vessel owner directly against the vessel's insurer using the insurance contract between the two entities. *Henderson*, 2013 WL 1245451, at *1–2. The court held that the non-signatory sailor was estopped from denying the contract's choice-of-law provision. *Id.* at *4. Its rationale was that "the relief [Plaintiff] seeks," meaning payment on the judgment, "is a benefit that depends on the existence of the insurance contract." *Id.*

The facts of this case place Plaintiffs in the same position as the law firm in *Robinson Brog* and the sailor in *Henderson*. The relief Plaintiffs seek—a declaratory judgment that Defendants are liable for commissions payable under the brokerage agreements and damages in the amount of such commissions, *see* Compl. at 26—is a benefit that depends on the charter parties for its existence. Without the charter parties, no right to commission would exist. Indeed, the charter parties themselves incorporate the commission rates that Plaintiffs negotiated. As Plaintiffs stated in the Complaint, Plaintiffs were "retained by [Defendant] Anemi prior to their 2007 retention to perform brokerage services *in connection with* the subject [Korea Line] charterparties herein." Compl. ¶ 24. Such negotiated rates "typically" later appear in the charter parties. Compl. ¶ 29. Plaintiffs negotiated their brokerage commissions "[w]ith respect to the 2007 [Korea Line] charters." Compl. ¶ 30. The lengths of the brokerage agreements were in

step with that of the charter parties. Compl. ¶ 33. Plaintiffs allege that they were instrumental in persuading Defendants not to terminate the charter parties when Korea Line went into rehabilitation proceedings, Compl. ¶ 58, and it is clear that Plaintiffs' payments depended on the continued existence of the charter parties. In fact, Plaintiffs' role as negotiators and deal brokers makes estoppel particularly appropriate in this case (even more so than in cases like *Henderson* where the plaintiff is a stranger to the original transaction). Plaintiffs here were present and involved in the transaction since its inception. Unlike the *Henderson* plaintiff, they had the opportunity to make their preference for resolving disputes in American courts under federal law known to the contracting parties.

Plaintiffs do not appear to seriously dispute that they are third-party beneficiaries. *See* Pl. Reply Mem. at 8. Their only argument on this point is that their claims arise out of a "prior independent agreement." *See id.* at 8 n.8. But this is the issue to be settled in response to the Second Circuit's second question on remand. As a result, the Court will analyze the choice-of-law question for Plaintiffs' claims arising under the charter parties as if the Plaintiffs had formally consented to the choice-of-law clauses in those contracts.

### B. Legal Standard for Evaluating the Choice-of-law Provisions

Having determined that the choice-of-law provisions in the charter parties apply to Plaintiffs' claims that arise under the charter parties, the next question is whether those clauses determine the outcome of the choice-of-law analysis. "The Supreme Court certainly has indicated that forum selection and choice-of-law clauses are presumptively valid where the underlying transaction is fundamentally international in character." *Roby*, 996 F.2d at 1362 (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). The Court articulated this rule in *Bremen*, 407 U.S. 1, a maritime contract case upholding a forum selection provision, and

its reasoning applies in equal force to choice-of-law clauses. *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007); *see also State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld*, 921 F.2d 409, 417 (2d Cir. 1990) (stating in the maritime context that "a contractual choice-of-law clause generally takes precedence over choice-of-law rules").  A strong preference for upholding choice-of-law clauses in such cases is necessary because "agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting." *Bremen*, 407 U.S. at 13–14.  Such provisions "eliminate uncertainty in international commerce and insure that the parties are not unexpectedly subjected to hostile forums and laws." *Roby*, 996 F.2d at 1363.  American courts also enforce such clauses for reasons of international comity.  *Id.*  Moreover, choice-of-law clauses should be enforced because they are an important part of contract negotiations, and their presence or absence affects other terms and the value of the contract as a whole.  *Id.*

When a court must select a governing body of law to interpret an arbitration agreement, an additional concern comes into play: the strong policy favoring a uniform body of law on arbitrability. *See Motorola*, 388 F.3d at 51.  In dealing with arbitration agreements between transnational parties, "applying the parties' choice of law is the only way to ensure uniform application of arbitration clauses within the numerous countries that have signed the New York Convention." *Id.*  Following the parties' choice of law under such circumstances is thus "fully consistent with the purposes" of the Federal Arbitration Act.  *Id.*; *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985) (presumption in favor of choice of forum clause "is reinforced by the emphatic federal policy in favor of arbitral dispute resolution").

All this is not to say that the presumptive validity of a choice-of-law clause cannot be overcome. Courts will not enforce a choice-of-law clause that is unreasonable under the circumstances. *Roby*, 996 F.2d at 1363. Choice-of-law and forum selection clauses are unreasonable:

> (1) if their incorporation into the agreement was the result of fraud or overreaching; (2) if the complaining party will for all practical purposes be deprived of his day in court, due to the grave inconvenience or unfairness of the selected forum; (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) if the clauses contravene a strong public policy of the forum state.

*Id.* (citations and internal quotation marks omitted). *Sarhank*, analyzed above, is best understood as a case in which the fourth prong of this test was met and the contract's choice of law and forum were overridden.

*Roby* holds its presumption in favor of reasonable choice-of-law clauses in common with other circuits. *See, e.g.*, *Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236, 242–243 (5th Cir. 2009) (maritime jurisdiction); *Chan v. Society Expeditions, Inc.*, 123 F.3d 1287, 1296–97 (9th Cir. 1997) (same); *Milanovich v. Costa Crociere, S.p.A.*, 954 F.2d 763, 767 (D.C. Cir. 1992) (same); *see also* Thomas J. Schoenbaum, 2 Admiralty & Mar. Law § 11-19 (5th ed. 2011) ("All forms of charter parties routinely provide for dispute settlement by arbitration, and this is generally upheld. . . . Choice of law clauses in charter parties are likewise valid." (footnotes omitted)). This approach is congruent with that of the Restatement, which states that choice-of-law provisions are binding unless (a) "the chosen state has no substantial relationship to the parties or the transaction *and* there is no other reasonable basis for the parties' choice," or (b) the chosen law would contradict fundamental public policy of otherwise-applicable law. Restatement (Second) of Conflict of Laws § 187 (emphasis added). In using the phrase "other reasonable basis," the Restatement specifically contemplates that parties to a multistate maritime

13

agreement "should be permitted to submit their contract to some well-known and highly

elaborated commercial law" with no other connection to the transaction. *Id.* cmt. f. The

Restatement is a major source of federal choice-of-law principles. *Pescatore v. Pan Am. World*

*Airways, Inc.*, 97 F.3d 1, 14 (2d Cir. 1996).

Plaintiffs emphasize *Advani Enterprises v. Underwriters at Lloyds*, 140 F.3d 157 (2d Cir.

1998), but it is not to the contrary. That case characterizes the federal maritime contract choice-

of-law test as an assessment of a series of contacts:

> (1) any choice-of-law provision contained in the contract; (2) the place where the contract
> was negotiated, issued, and signed; (3) the place of performance; (4) the location of the
> subject matter of the contract; and (5) the domicile, residence, nationality, place of
> incorporation, and place of business of the parties.

*Id.* at 162. This type of contacts analysis, a variant of the test laid down by the Supreme Court in

the maritime tort context in *Lauritzen v. Larsen*, 345 U.S. 571 (1953), is commonly employed by

courts in this Circuit when examining maritime contracts. *See, e.g.*, *Blue Whale*, 722 F.3d 488.

However, in other such cases, the Second Circuit typically determines whether any choice-of-law

provision binds the parties, and only proceeds to a contacts analysis if the answer is no. *See id.*

at 495–500 (rejecting choice-of-law clause, then proceeding to contacts analysis). If the court

does employ contacts analysis, the choice-of-law clause does not factor into discussion of what

law should apply. *See id.* at 499–500 & n.11 (enumerating and applying maritime choice-of-law

factors without including the choice-of-law clause); *Skuld*, 921 F.2d at 417 (same). This method

follows dicta in *Lauritzen* itself that "[e]xcept as forbidden by some public policy, the tendency

of the law is to apply in contract matters the law which the parties intended to apply." *Lauritzen*,

345 U.S. at 588–89. Accordingly, the Circuit has flagged *Advani*'s incorporation of the choice-

of-law provision as a factor in the contacts analysis as an outlier. *See Philips*, 494 F.3d at 384.

Despite this tension, *Advani* need not be read to contradict *Roby* and the Supreme Court cases underlying the latter case. Like *Roby*, *Advani* begins its analysis with the choice-of-law clause, and ultimately concludes that the law selected by the clause governs the case. *Advani*, 140 F.3d at 162–63. Nor does it treat all factors equally. The choice-of-law provision, after suitable probing, is awarded "considerable weight." *Id.* at 162. If the choice-of-law clause factor is treated as *primus inter pares*, then the other factors can be understood as going to the fairness or unfairness of the parties' selected law—or as concerns that come into play if the choice-of-law clause turns out not to be binding. Thus, *Advani* can be harmonized with the *Roby/Bremen* framework. This reading is supported by the relevant post-*Bremen* case law cited by *Advani* in support of its formulation of the contacts test, which analyzes choice-of-law clauses prior to and separately from other contacts. *See Sundance Cruises Corp. v. Am. Bureau of Shipping*, 7 F.3d 1077, 1081 (2d Cir. 1993); *Milanovich*, 954 F.2d at 767. Subsequent district court opinions applying *Advani* to choice-of-law clauses have proceeded similarly. *See Henderson*, 2013 WL 1245451, at *3; *Thomas v. NASL Corp.*, No. 99-cv-11901, 2000 WL 1725011, at *8 (S.D.N.Y. Nov. 20, 2000); *N.Y. Marine & Gen. Ins. Co. v. Tradeline (LLC)*, No. 98-cv-7840, 1999 WL 1277244, at *3 (S.D.N.Y. Nov. 29, 1999). Each of these cases considers the *Advani* factors, but states that the choice-of-law clause factor governs unless narrow exceptions are met. This is the most analytically sound way to integrate the two bodies of precedent.

Additionally, the Court notes that the instant case is distinguishable from *Advani* because this case concerns an international arbitration agreement. As discussed above, *Motorola* makes clear that it is especially important for a court to uphold a choice-of-law clause in the international arbitration context. *Motorola*, 388 F.3d at 51. In *Motorola* itself, the court upheld

choice-of-law clauses selecting Swiss law without performing contacts analysis, in a dispute with no apparent connection to Switzerland. It would therefore be especially inappropriate to rely on an overly cramped reading of *Advani* as justification for refusing to give appropriate weight to the choice-of-law clauses in the present case.

Given the above analysis, the Court will apply the following test to determine what nation's law should be used to interpret the charter parties: A choice-of-law clause in a contract is presumptively valid where the underlying transaction is fundamentally international in character. The presumption of validity will be overcome if application of the choice-of-law clause would be unreasonable under the circumstances. Applying a choice-of-law clause is unreasonable under the circumstances if (1) the incorporation of the choice-of-law clause into the agreement was the result of fraud or overreaching; (2) if the complaining party will for all practical purposes be deprived of his day in court, due to the grave inconvenience or unfairness of the selected forum; (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) if the clause contravenes a strong public policy of the forum state. *Roby*, 996 F.2d at 1363. In evaluating whether any of these four conditions have been met, the Court will look to (among other things) the following factors: (1) any choice-of-law provision contained in the contract; (2) the place where the contract was negotiated, issued, and signed; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Advani*, 140 F.3d at 162.

## C. The Choice-of-law Clauses Govern the Contract

Applying this test here, the Court concludes that Plaintiffs have failed to demonstrate that enforcement of the choice-of-law clauses would be unreasonable. On the first *Roby* factor,

Plaintiffs do not allege that the provisions were introduced into the charter parties by fraud, or that they were somehow misled about the operative law or the effect of the arbitration provisions when they accepted their commissions. As to the second factor, nothing in the record suggests that an English forum would be gravely inconvenient for Plaintiffs, sophisticated firms that regularly participate in complex international maritime transactions. Nor is there any reason to think that the English arbitrators would be biased or unfair. Indeed, in *Bremen*, the Supreme Court observed that England was a natural choice for parties seeking "a neutral forum with expertise" in admiralty litigation. *Bremen*, 407 U.S. at 12. As to the third factor, "it is not enough that the foreign law or procedure merely be different or less favorable than that of the United States." *Roby*, 996 F.2d at 1363. To prevent the application of the choice-of-law clauses, English law would need to treat Plaintiffs unfairly or deprive them of any remedy for their claims. *Id.* Plaintiffs have not suggested that this would come to pass, nor can this Court see any reason why it should. Finally, the fourth factor asks whether applying the choice-of-law clauses would be contrary to a strong public policy of this forum. As discussed above, the fact that Plaintiffs are not signatories to the charter parties does not generate relevant public policy concerns. Plaintiffs have not brought any other public policy issues to the Court's attention.

Although the Court is not convinced that the remaining *Advani* factors should receive attention in a case concerning valid choice-of-law clauses in international arbitration agreements, it is noteworthy that the contacts with the United States are not so significant as to call into question the presumption that the English law clauses govern the contracts. Plaintiffs present an America-centric account of the case: their commissions were negotiated, issued, and signed in the United States; their payments were due in the United States; the subject matter of the contract

(their commissions) relates to the United States; Plaintiffs are incorporated in the United States, and Defendants have their principal place of business here. Pl.'s Br. on Remand at 4–5.

To accept this analysis would be to let the tail wag the dog. The contracts subject to contacts analysis are the charter parties in their entirety, not merely the minor provisions relating to Plaintiffs' commissions—and certainly not the May 4, 2007 emails, which Plaintiffs argue form an entirely separate contract. *See, e.g.*, *Henderson*, 2013 WL 1245451, at *4 (applying *Advani* factors to entire underlying contract between original parties in suit by non-signatory beneficiary). Once this is understood, the place of performance and subject matter of the contract factors become neutral. The charter parties concern the hire of a small fleet of oceangoing cargo vessels. The location of their subject matter and the place of performance are therefore "numerous ports around the world" rather than the United States. *Tradeline*, 1999 WL 1277244, at *3 n.1; *see also Iroquois Gas Transmission Sys. v. Associated Elec. & Gas Ins. Servs.*, No. 05-cv-2149, 2006 WL 903223, at *2 (S.D.N.Y. Apr. 5, 2006) ("As to the third factor, the place of performance was 'worldwide,' and therefore is neutral."). The law of the flag for each of the thirteen vessels involved in the charter parties is the Marshall Islands. Compl. ¶ 20.

Similarly, when considering the domicile, residence, nationality, place of incorporation, and place of business of the parties, the Court looks primarily at the *parties to the contract*, not the parties to this lawsuit. *See, e.g.*, *Iroquois*, 2006 WL 903223, at *2. ICS is a New York corporation with its principal place of business in New Jersey, and Peraco is incorporated and has its principle place of business in Connecticut. Compl. ¶¶ 12, 14. However, despite their role in the contract negotiations, Plaintiffs are not parties to the contracts, and thus their locations are less significant than those of the other participants. Korea Line, the charterer, is a Korean corporation with its principal place of business in Korea. Weller Decl. ¶ 2. A third nonparty

broker that participated in the transaction, Overseas Shipping Corporation ("Overseas"), is also

Korean. Dushas Aff. ¶ 15.  Anemi, Korea Line's counterparty in the contracts, was a Liberian

corporation whose primary place of business appears to have been Greece (despite the presence

of an authorized agent in New York).  *See* Compl. ¶ 18; Weller Remand Decl. ¶ 4 (Dkt. No. 61);

Dushas Reply Aff. ¶¶ 5–7.  The individual ship-owning Defendants are all Marshall Islands

corporations, as is Eagle (the eventual acquirer of the other Defendants), though Eagle's

principal place of business is in the United States.  *See* Compl. ¶¶ 16, 20.  This factor therefore

does not point strongly in any particular direction.  At the time the charter parties were signed,

the diversity of the parties involved made the selection of a neutral, reliable forum and law in

which to resolve disputes natural and desirable.  Hammond Reply Aff. ¶ 10; *see Bremen*, 407

U.S. at 11–12.

    This leaves only the place of contracting.  This is the factor that points most strongly

towards the United States, but even this does so weakly.  The charter parties themselves state that

they were "made and concluded" in Jersey City, New Jersey.  *See* Weller Decl. Ex. A at 1 (Dkt.

No. 4-1).  The signature line for Korea Line indicates that it was located in Seoul, South Korea,

*id.* at 4, although Plaintiffs have presented an affidavit stating that Korea Line, too, signed the

charter parties in New York, *see* Dushas Reply Aff. ¶ 9.  The evidence in the record does not

explicitly address the place of negotiations for all parties.  Plaintiffs and Anemi's authorized

agent were in the United States during the negotiation period, and seem to have negotiated from

there.  Plaintiffs' affidavit intimates that Korea Line flew to New York for several "important

meetings," but presumably they (and Overseas) conducted any discussions outside of such

meetings from Korea.  *Id.*  This factor alone is not enough to establish a sufficient interest on

behalf of the United States to outweigh the otherwise-valid choice-of-law clauses in the

contracts. *See* Restatement (Second) of Conflict of Laws § 188 cmt. e ("This contact is of less importance when there is no one single place of negotiation and agreement[.]").

The Court therefore concludes that the law of England governs claims under the charter parties. The choice-of-law clauses control the outcome here, and Plaintiffs as non-signatories are nonetheless bound by those provisions. As the Second Circuit determined, under English law, Plaintiffs are considered to be covered by the phrase "Owners and the Charterers" under a theory of assignment. They therefore fall within the scope of the arbitration clauses, and are bound to bring any claims arising under the charter parties to arbitration in London.

### III.   Additional Briefing is Necessary to Determine Whether Plaintiffs Have Claims Independent of the Charter Parties

The Court now turns to the question of whether Plaintiffs have claims that are independent of the charter parties—claims that therefore would not be subject to the charter parties' arbitration clauses. Although the parties briefed the issue on remand, the Court's decision in Part II of this order, *supra*, vitiates many of the arguments deployed. Furthermore, the question of independence raises several difficult legal questions, particularly questions of choice of law, which have not been adequately addressed. The Court therefore orders the parties to file briefs addressing the following questions:

1. Should the question of whether Plaintiffs have claims independent of the charter parties—claims that cannot be arbitrated—be determined by this Court, or by the arbitrators in England?

2. If the Court should make the determination, then as a matter of contract law, do Plaintiffs have claims against Defendants independent of the charter parties?

3. If Plaintiffs' claims are independent as a matter of contract law, is there any reason why they must still arbitrate such claims under the charter parties?

For *each* of these questions, the parties should (a) address whether English or federal law applies, (b) explain how the question should be resolved under English law, and (c) explain how the question should be resolved under federal law.

4. Finally, the parties should address what would happen if the Court, applying federal law, determines that Plaintiffs must arbitrate all of their claims in London—yet under English law, the arbitrators would refuse to hear some or all of those claims.

Defendants' brief of no more than 15 pages will be due on October 29, 2015.  Plaintiffs' response brief of no more than 15 pages will be due on November 12, 2015.  Defendants' reply brief of no more than 5 pages will be due on November 19, 2015.

## IV.   Conclusion

For the foregoing reasons, the Defendants' motion to compel arbitration is GRANTED in part.  Further briefing is ordered as described above.


SO ORDERED.


Dated: October **8**, 2015
        New York, New York

_____
        ALISON J. NATHAN
        United States District Judge

21